OPINION OF THE COURT
Fuchsberg, J.
A jury found the defendant Vida Gissendanner guilty of the criminal sale of cocaine (Penal Law, § 220.16). The Appellate Division has affirmed the judgment of conviction by a vote of 4 to 1.
The primary issue on the present appeal is the propriety of the trial court’s refusal to honor defendant’s request that it issue subpoenas duces tecum requiring the production of personnel records of two police officers, the principal witnesses against the defendant. Implicated by this denial, asserts the defendant, are the constitutional and statutory guarantees of compulsory process and, ultimately, the companion right of confrontation which the records may have supported (see Pointer v Texas, 380 US 400; Washington v Texas, 388 US 14; US Const, 6th Arndt; Civil Rights Law, § 12). A second issue requires us to decide whether in-court identifications by the officers, each of whom had also had occasion to see the defendant on the date of her arrest, should have been received in the light of the District Attorney’s failure to serve the pretrial notice required by CPL 710.30 (subd 1).
Turning initially to the question involving the subpoenas, we focus on the trial events from which it arises:
The chief prosecution witness, Ronald Eisenhauer, an undercover investigator for the Irondequoit Police Department, testified that the defendant had made the illegal sale to him. According to Eisenhauer, he and three other officers proceeded to defendant’s home, where the other three took up surveillance from an unmarked car parked across the street while he approached her house. Encountering the defendant, whom he had previously met, on the walk leading to the house, he was invited inside where, after she asked him if he wished to purchase drugs, the illegal sale was negotiated. They were alone at the time.
Investigator David Grassi, one of the officers in the surveillance team, also was called. He testified that, though he did not witness the actual sale, from his position in the driver’s *547 seat he observed Eisenhauer enter the house with defendant and then exit alone about 15 minutes later. A third occupant of the police vehicle, Detective Craig Corey, also took the stand; he told the jury that he had watched Eisenhauer approach the house but, because his view of the entrance was partially obscured by hedges, did not witness Eisenhauer actually enter the house or see the defendant at all.
The defendant, testifying in her own behalf, recited a story materially at odds with the Eisenhauer-Grassi version. While she acknowledged having met Eisenhauer on several prior occasions, she denied ever having sold drugs to him. As to the night of the crime, she related that, on that evening, as she was driving toward her home, she observed Eisenhauer standing on the porch near the door, whereupon she drove past the house and, returning a short time later, noticed him leave the porch and get into a parked car.
Given this scenario, not surprisingly, defendant’s trial strategy concentrated on undermining the credibility of Eisenhauer and Grassi in order to persuade the jury that they had concocted the story of the drug sale. To that end, defense counsel, on the eve of trial, for the first time requested the court to issue subpoenas duces tecum broadly framed to compel the production of "any and all records of [Eisenhauer’s and Grassi’s] employment * * * with the Irondequoit Police Department and any other law enforcement agency, [including] records of performance in any disciplinary actions.” In support of this application, counsel stated only that the purpose was to "find material appropriate for cross-examination when the officers testify”; at no time did he request the court to conduct its own in camera inspection of the personnel files before determining whether any of the contents should be disclosed. The court refused to issue the subpoena on the grounds that "no factual basis”, nor any "showing of necessity other than a general discovery” had been demonstrated to warrant such an order. In its opinion of affirmance, the Appellate Division, in the same vein, characterized the unembellished request for the subpoenas as no more than an attempt to conduct a "fishing expedition” into confidential records. In our view, the ruling was not erroneous. Our reasons follow.
At the outset, we recognize the tension between the constitutionally based rights of an accused to confront and cross-examine adverse witnesses on the one hand, and the interest *548 of the State and its agents in maintaining confidential data relating to performance and discipline of police on the other. Among other values the latter is said to serve are the maintenance of police morale and the encouragement of both citizens and officers to co-operate fully without fear of reprisal or disclosure in internal investigations into misconduct. As to those accused of crime, it should be too obvious to need reiteration that restrictions on the right to cross-examine key prosecution witnesses can deprive a defendant of an important means of combating inculpatory testimony or at least demonstrating the existence of a reasonable doubt as to guilt (Davis v Alaska, 415 US 308, 315-317; Douglas v Alabama, 380 US 415, 418; cf. Greene v McElroy, 360 US 474, 496-497).
Granting, however, that the constitutional roots of the guarantees of compulsory process and confrontation may entitle these to a categorical primacy over the State’s interest in safeguarding the confidentiality of police personnel records, it is not to be assumed that, in striking the balance between the two, police confidentiality must always yield to the demands of a defendant in a criminal case. The circumstances which support such demands may vary greatly. And, though access must be afforded to otherwise confidential data relevant and material to the determination of guilt or innocence, as, for example, when a request for access is directed toward revealing specific "biases, prejudices or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand” (Davis v Alaska, supra, at p 316), or when it involves other information which, if known to the trier of fact, could very well affect the outcome of the trial (cf. United States v Garrett, 542 F2d 23, 26; United States v Cardillo, 316 F2d 606, 611, 615-616, cert den 375 US 822), there is no such compulsion when requests to examine records are motivated by nothing more than impeachment of witnesses’ general credibility. In such cases, the defendant’s rights have generally been canalized within the bounds of the traditional evidentiary rule that governs the introduction of extrinsic proof of matters collateral to the issues at trial, i.e., its availability rests largely on the exercise of a sound discretion by the trial court (see People v Ocasio, 47 NY2d 55, 60; People v Schwartzman, 24 NY2d 241, 245, cert den 396 US 846; People v Sorge, 301 NY 198, 202; 3A Wigmore, Evidence [Chadbourn rev], §§ 1005, 1006; Richardson, Evidence [10th ed — Prince], § 491).
Thus, in Davis v Alaska (supra), the Supreme Court found *549 the Sixth Amendment had been violated because the defendant had been precluded from establishing an eyewitness’ status as a juvenile delinquent probationer to support the contention that his unfavorable testimony had been inspired by a desire to curry favor with the prosecution. Justice Stewart, in a concurring opinion, pointedly observed that the Constitution did not confer "a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions” (emphasis ours) (415 US, at p 321; cf. People v Sandoval, 34 NY2d 371).
But when a defendant shows a likelihood that the witness’ prior criminal or disciplinary record may provide a motive to falsify, disclosure of this information has been held warranted (Davis v Alaska, supra; cf. People v Cwikla, 46 NY2d 434). Also, when prior bad acts allegedly contained within disciplinary or personnel records bear peculiar relevance to the circumstances of the defendant’s case, detailed cross-examination and disclosure, usually after an in camera inspection, have been permitted (see People v Puglisi, 44 NY2d 748 [narcotics case; defense counsel had information that undercover officer who testified had improperly handled previous "buys”]; People v Vasquez, 49 AD2d 590 [narcotics case; testifying police officer had been convicted for "shaking down” narcotics dealers]; Pitchess v Superior Ct., 11 Cal 3d 531; State v Pohl, 89 NM 523; State v Fleischman, 10 Ore App 22 [all involving prosecutions for assault on police officers; defendants claimed officers were the aggressors and made a predicate showing that each had previously been accused of employing excessive force]; United States v Garrett, 542 F2d 23, supra [held error to restrict cross-examination of undercover policeman about prior suspension for refusal to take urine test to determine whether he had used drugs]).
Conversely, access has been denied in cases in which the defendant failed to demonstrate any theory of relevancy and materiality, but, instead, merely desired the opportunity for an unrestrained foray into confidential records in the hope that the unearthing of some unspecified information would enable him to impeach the witness (see People v Norman, 76 Misc 2d 644 [police personnel records]; State v Sagner, 18 Ore App 464 [police disciplinary records]; Commonwealth v Santos, — Mass —, 384 NE2d 1202 [sealed juvenile record]). Indeed, entitlement to access on no more than a bare allegation that *550 the inspection is sought as fodder for an untracked attack on credibility would render the principle of confidentiality meaningless for all practical purposes.
The thread that runs through these cases does not indicate that a defendant must make a preliminary showing that the record actually contains information that carries a potential for establishing the unreliability of either the criminal charge or of a witness upon whose testimony it depends. The decisions erect no inviolable shield to prevent the discovery of what might turn out to be relevant and exculpatory material. What they do call for is the putting forth in good faith of some factual predicate which would make it reasonably likely that the file will bear such fruit and that the quest for its contents is not merely a desperate grasping at a straw. Here there was no such demonstration.
Here, defendant’s counsel made no pretense but that the records’ contents would not directly bear on the hard issue of guilt or innocence; he cited no possible line of inquiry in which they might be employed beyond that of general credibility impeachment. Even on that score, no basis was presented, in the form of information from any extraneous source or otherwise, to suggest that either of the officers had ever committed a discreditable act on which one could premise an inference that impeachable material tending to affect their credibility was to be found in their files. In short, nothing better than conjecture having been presented to the court, it acted well within its range of discretion in rejecting the application.
Nor is our conclusion that there was no abuse of discretion as a matter of law shaken by two subsidiary arguments defendant mounts on the subpoena issue. The first of these is a claim that the files became especially relevant when Detective Corey testified that, unlike Eisenhauer and Grassi, he had not observed the defendant on the walkway. But what defendant characterizes as a "diametrically opposed” version of events, not only may be self-explained by the partially obscured view, but need not have been perceived as indicative of anything worse than the kind of discrepancy that differing faculties of concentration and memory will commonly produce in the most honest of witnesses. Dispositive, in any event, is the fact that defendant did not renew her subpoena application, either then or thereafter (see CPL 470.05, subd 2).
The second argument is posited on the rule articulated in *551 Brady v Maryland (373 US 83), under which a defendant is entitled as a matter of due process to any evidence within the possession of the prosecutor that can be considered exculpatory and "material either to guilt or to punishment” (373 US, at p 87). Noting that, in general, the subpoena duces tecum may not be used for the purpose of discovery or to ascertain the existence of evidence (see People v Coleman, 75 Misc 2d 1090, 1091), and putting aside for now the question of whether, for Brady purposes, confidential police personnel files are within the possession and control of the prosecution (compare People v Sumpter, 75 Misc 2d 55, 58, with People v Norman, 76 Misc 2d 644, 649-650, supra), the simple answer to this contention is that there emerged not the slightest inkling that the personnel records contained any exculpatory material. More specifically, though recognizing that the right to cross-examine witnesses subsumes the right to obtain disclosure of their prior statements in the case (People v Rosario, 9 NY2d 286), in doing so we have made clear that this is not so broad as to permit a roving tour through the prosecutor’s files and that, at times, the necessities of effective law enforcement may require that such information be kept confidential (9 NY2d, at p 290; People v Poole, 48 NY2d 144, 149).
Before leaving the issues centering on the police personnel records, we also take occasion to point out that the Legislature has recently codified standards for disclosure of precisely the material sought in this case. Section 50-a of the Civil Rights Law, though effective after the defendant’s trial, fairly reflects the pre-existing judicial consensus in such situations; after declaring police personnel records to be confidential, it provides that, on "a clear showing of facts sufficient to warrant the judge to request records for review”, an in camera inspection is to be conducted and, if the court then determines that the records contain matter that is relevant and material in the action, such portions may be disclosed to the person who has made the request (Civil Rights Law, § 50-a, subds 2, 3). As we have emphasized, dehors the statute, the application here was devoid of any good faith demonstration that the matter sought was material and relevant, and no request was ever made that the court conduct a preliminary in camera review of the records to determine whether disclosure of some portions at least was warranted (see People v Poole, supra).
We turn now, though more briefly, to defendant’s claim that the District Attorney should have provided pretrial no *552 tice of the fact that Officers Eisenhauer and Grassi had occasion to view the defendant subsequent to their observations of her on the night of the crime. Eisenhauer led the police in arresting the defendant several months after the drug sale, while Grassi by happenstance saw the defendant after she had been brought to the police station following her arrest. Though the in-court identification testimony of the police officers was based on their viewing of her during the commission of the crime and, in Eisenhauer’s case, on two conceded previous contacts, the defendant takes the position that the subsequent sightings fall within CPL 710.30, which provides for pretrial notice of the prosecutor’s intention to offer at trial, inter alia, "testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him as such” (subd 1, par [b]). We disagree.
The statute was apparently a legislative response to the problem of suggestive and misleading pretrial identification procedures treated by the Supreme Court in Gilbert v California (388 US 263), United States v Wade (388 US 218) and Stovall v Denno (388 US 293). The focus of those decisions was on in-court identifications predicated on earlier police-arranged confrontations between a defendant and an eyewitness, typically involving the use of lineups, showups or photographs, for the purpose of establishing the identity of the criminal actor (see Levine & Tapp, Psychology of Criminal Identification: The Gap from Wade to Kirby, 121 U of Pa L Rev 1079, 1086 et seq.).
In cases in which the defendant’s identity is not in issue, or those in which the protagonists are known to one another, "suggestiveness” is not a concern and, hence, the statute does not come into play (see People v Bullock, 45 AD2d 902, 903; Sobel, Eye-Witness Identification: Legal and Practical Problems, § 2, p 4; State v Thomas, 292 NC 527, 539; State v Wheeler, 34 NC App 243, 251 [inadvertent observations of defendant at police station not "identifications”]).
In all, neither police officer having "previously identified” the defendant within the intendment of the statute, defendant’s objection to their in-court identification testimony was properly overruled.
On the rationales set out in this opinion, and because we *553 find the defendant’s remaining contentions, too, lack merit, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order affirmed.