Eustace MINETOS, Petitioner,

v.

Charles SCULLY, Superintendent, Green Haven Correctional Facility, as Agent for the State of New York and Robert Abrams, the Attorney General of the State of New York, Respondents.

No. 84 Civ. 7791 (RWS).

United States District Court, S.D. New York.

Jan. 6, 1986.

Eustace Minetos, Stormville, N.Y., pro se.

Carl A. Vergari, Dist. Atty. of Westchester County (Richard E. Weill, Gerald D. Reilly, Asst. Dist. Attys., White Plains, N.Y., of counsel), for respondents.

## OPINION

SWEET, District Judge.

Eustace Minetos ("Minetos") was convicted in the New York Supreme Court of Westchester County of robbery in the first degree N.Y.Penal Law, § 160.15, on September 23, 1981. He was sentenced to an indeterminate prison term with a minimum of ten years and a maximum of twenty years. He petitions for a writ of habeas corpus on the grounds that his conviction was based on the admission of identification evidence secured through pretrial identification procedures which were so suggestive as to create substantial likelihood of irreparable misidentification and that he was deprived of his constitutional right to compulsory process for obtaining witnesses in his favor. For the reasons set forth below, the motion is denied.

## FACTS

### The Robbery

At approximately 7:00 p.m. on February 14, 1981, Bert Wolneck ("Wolneck") started his regular evening shift as bartender at the Fife and Drum Restaurant in Mt. Kisco, New York. It was a busy evening at the bar, which usually remained open until 4:00 a.m. Minetos, known to Wolneck as "Steve," entered the tavern at about 1:00 a.m. Wolneck was casually acquainted with Minetos. During the course of the evening they spoke briefly, exchanging pleasantries. Minetos left the tavern at about 4:15 a.m. At 4:30 a.m. the lights in the bar were turned up. The remaining patrons left, and Wolneck, alone in the tavern, began the chores of closing up.

At 5:10 a.m. an individual appeared in the tavern. He was holding a pistol in his hand and wore a woman's stocking pulled over his head so that Wolneck was unable to see his face. The intruder was dressed in a blue jacket, tan slacks, brown shoes and was wearing gloves. He confronted Wolneck and said in a voice with a Southern accent that he wanted the receipts from the register. Wolneck retrieved the bagged receipts, which amounted to approximately $600 in cash and $700 in checks, and handed them to the robber, who then ordered him to the office of the tavern. Wolneck walked to the office of the tavern with the intruder behind him. At the office Wolneck was ordered to sit in a chair facing the wall. The room was well lit and Wolneck could see the robber's reflection in a mirror. At that point the robber engaged Wolneck in a brief conversation, inquiring into the location of a safe and whether Wolneck owned the establishment. Wolneck later testified at trial that once they were at the office, the intruder's Southern accent began to fade, and at that point Wolneck recognized the robber's voice and formed an opinion that the intruder was "Steve." After Wolneck responded that he was not aware of a safe on the premises and was not the owner, the intruder tied him to the chair, took the money and left. Wolneck was able to free himself from the chair in about thirty seconds. He then telephoned his boss and reported the robbery. The entire incident lasted about seven minutes. During that period Wolneck was able to observe the thief for about two or three minutes.

### The Investigation

At approximately 5:20 a.m. Officers Richard Stoorza, William Marlbury and Ronald Buxton of the Mt. Kisco Police Department were called upon to investigate the robbery which had just taken place at the Fife and Drum Restaurant. At trial there were discrepancies in the testimony of the various witnesses as to which police officer actually interviewed Wolneck at the scene of the robbery, and whether or not Wolneck named "Steve" as the thief at that time. Stoorza and Marlbury admitted that they received their information not from the victim Wolneck but instead from Officer Buxton. Wolneck testified that he spoke to "at least three" police officers immediately after the incident, that he gave the descrip-

tion of the robber, including the name "Steve" to a "sergeant" whose name he did not know, but that it was not Patrolman Buxton. Patrolman Stoorza and Marlbury both testified that they did not speak to any witness at the scene. Patrolman Buxton later submitted a signed police incident report of an interview with Wolneck taken immediately after the incident. That report described the perpetrator as "a male, possibly white, speaking with a put-on Southern accent, approximately five-eight, about one hundred and fifty-five to one hundred and sixty pounds." Police Officer Buxton did not testify at trial.

At approximately 6:30 a.m. a 1973 green Chrysler that Officer Stoorza had previously noticed at 5:15, the time of the robbery parked within 100 yards of the Fife and Drum Tavern was traced to 70 Barker Street, apartment 608 in the village of Mt. Kisco. The police were admitted to that residence by a female occupant. Minetos was present in the apartment as were other individuals. Minetos was wearing a sleeveless t-shirt, blue jeans and brown loafers. On a table and chair in the dining room were a blue jacket and a pair of beige colored pants. In response to police questioning, Minetos stated that he had been to the Fife and Drum that evening, that he had used the green Chrysler and that the jacket and slacks in the dining room belonged to him. Minetos then agreed to comply with the request of the police to accompany them to headquarters. Before leaving, Minetos, on his own initiative, changed out of the jeans he had been wearing when the police arrived and into the light-colored pants that had been in the dining room. He also put on a three-quarter length coat. As they were leaving an officer picked up the blue jacket that was in the dining room and brought it along to police headquarters.

No pistol or cash was ever retrieved in connection with the robbery.

### The Show-Up Identification

After Minetos was brought to police headquarters in the early morning, a detective contacted Wolneck and asked him "to come down and make an identification." Later at trial there was considerable controversy over whether or not Wolneck had recognized the robber to be Minetos who he knew as "Steve" at the time of the robbery identification, that is, whether he believed it was Minetos who had robbed him before seeing him at the police station.

Minetos was presented by the police to Wolneck in a show-up alone rather than in a multiple person lineup. Wolneck was brought to a back office of the police station to identify Minetos, who was dressed in the brown sweater, the slacks and brown shoes he had worn from 70 Barker Street. Wolneck did not make an immediate identification. Petitioner was then asked to put on the blue jacket which the police had brought along from 70 Barker Street. After Minetos donned the blue jacket approximately two minutes after the procedure started, Wolneck identified him as the individual who had committed the robbery earlier that morning.

### The Trial

Wolneck testified at trial that before he got to the police station he was "fairly certain" that Minetos was the individual who had robbed the tavern, but that he had identified both the man and the clothes. He testified that at some point during the robbery he had determined the masked thief was "Steve" but that, at the show-up, the clothes that Minetos was wearing were a "re-inforcing factor" in his identification. He was the only eyewitness to the robbery. At trial the prosecution produced Patrolman Ronald Buxton's report which indicated that he was the investigative officer to whom Wolneck had given his description of the assailant, but did not call him as a witness. On learning of the defenses' effort to subpoena Buxton, the trial judge stated that "if he was subpoenaed properly and legally, I'll issue a bench warrant to get him down here." Counsel for the defense then requested an adjournment in order to procure his investigator who would testify that he had served a subpoena for Patrolman Buxton on the Desk Sergeant at the Mt. Kisco police headquarters,

which was where Buxton usually worked, and that he had done so because Buxton had been absent on that day. In the alternative the defense offered to supply the court with an affidavit of service. The court ruled that it would not issue the bench warrant because Buxton had not been properly personally served with process, and that under the applicable law leaving the subpoena at the witnesses' regular place of employment was only sufficient if he had been on duty, working, at the time. No request for a continuance to serve Buxton personally was made by the defense. The defense request for a missing witness charge was denied.

### Procedural History

At a pretrial hearing held on September 14, 1981, Minetos' motion to exclude identification evidence based on the allegedly suggestive identification procedure was denied. The case went to trial on September 18, 1981, during the course of which the jury heard testimony from Wolneck identifying Minetos as the person who had robbed him at the tavern. Testimony was also heard from Wolneck concerning the circumstances of the show-up identification.

On September 23, 1981, the jury found Minetos guilty of robbery in the first degree, N.Y.Penal Law Section 160.15, subdivision 4; guilty of criminal use of a firearm in the first degree, N.Y.Penal Law § 265.-09; guilty of grand larceny in the third degree, N.Y.Penal Law Section 155.30; guilty of unlawful imprisonment in the second degree, N.Y.Penal Law § 135.05, and guilty of criminal mischief in the fourth degree, N.Y.Penal Law Section 145.00. The trial judge sentenced Minetos on October 14, 1981 as a second felony offender to serve two indeterminate terms of imprisonment of not less than ten years and not more than twenty years, an indeterminate term of imprisonment of not less than two years and not more than four years, and two definite terms of imprisonment of one year, all to run concurrently. On direct appeal, the Appellate Division affirmed this judgment, *People v. Minetos*, 97 A.D.2d

801, 468 N.Y.S.2d 589 (1983), and leave to appeal was denied by the New York Court of Appeals, *People v. Minetos*, 61 N.Y.2d 676, 472 N.Y.S.2d 1037, 460 N.E.2d 240 (1983).

### Compulsory Process

For his first point, Minetos argues that the failure of the trial court to grant a continuance to procure a witness expected to be called by the state deprived Minetos of the right to compulsory process.

■ The constitutional right of the accused to have compulsory process to obtain witnesses in his defense is well established. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, not every denial of a motion for a continuance to obtain witnesses violates the accused's right to compulsory process. *See, e.g., McKinney v. Wainwright*, 488 F.2d 28 (5th Cir.1979). The denial of a motion for continuance is entrusted to the sound discretion of the trial judge. *United States v. Leach*, 429 F.2d 956 (8th Cir.1970). A defendant is deemed to have waived his right to compulsory process where his counsel fails to move for such process. *United States v. DiGregorio*, 148 F.Supp. 526 (S.D. N.Y.1957); *Eaton v. United States*, 437 F.2d 362 (9th Cir.1971).

■ The record reveals that the defense counsel did not properly request an adjournment at trial to secure the attendance of Patrolman Buxton. Minetos therefore cannot be heard to claim that the trial court's failure to grant a continuance to procure Patrolman Buxton deprived petitioner of the right to compulsory process. Defense counsel did request an adjournment in order to call his investigator to testify that a subpoena for Buxton was served, thereby supporting his request for the missing witness charge. The pertinent part of the record reads as follows:

Mr. Naderio [Defense Counsel]: ... [Y]our Honor, my application at this point is in the alternative, either for an adjournment to have Mr. O'Connor [the defense investigator who attempted to serve process on Buxton] come in and

testify, or for the court to accept this affidavit of service and to give me the missing witness charge.

Since defense counsel did not request an adjournment to secure the presence of Buxton after he failed to appear, but only requested a continuance to secure the appearance of the defense investigator, petitioner cannot now claim that he was denied compulsory process of a witness he never requested the trial court to produce. Minetos does not raise the issue of whether it was a denial of due process to refuse to give the missing witness charge on the basis of the affidavit, and so we do not address it here.

### Reliability of Witness Identification

For his second point, Minetos claims that the one man show-up was unnecessarily suggestive so as to taint Wolneck's identification and that there was no independent basis for a reliable identification.

Due process of law required in state criminal proceedings under the Fourteenth Amendment to the United States Constitution, mandates that eyewitness identification evidence is not reliable and must be suppressed "if suggestive identification procedures have led to a very substantial likelihood of irreparable misidentification." *Kirby v. Illinois,* 406 U.S. 682, 691, 92 S.Ct. 1877, 1883, 32 L.Ed.2d 411 (1972).

■ The admission of testimony concerning a suggestive and unnecessary identification procedures does not violate due process so long as the identification possesses sufficient aspects of reliability. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140. However, even an impermissibly suggestive pretrial identification procedure does not render an identification inadmissible in court if, considering the totality of the circumstances, there is sufficient evidence of reliability apart from the tainted identification. If so, the identification is admissible independent of the suggestive nature of the pretrial identification. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Hence, the due process requirements governing the admissibility of identification evidence involves a two party inquiry. First, the pretrial identification must be scrutinized to determine whether it was unnecessarily suggestive of Minetos guilt to Wolneck. If the pretrial procedure is found to have been conducted improperly, no in-court identification of the defendant by such witness may be received in evidence "without first determining that [the in-court identification] was not tainted by the illegal line-up but [was] of the independent origin." *Gilbert v. State of California,* 388 U.S. 263, 288, 87 S.Ct. 1951, 1961, 18 L.Ed.2d 1178 (1967).

■ Five factors to be considered as independent indicia of the reliability of a witness' identification are: 1) the opportunity of the witness to view the suspect at the time of the crime; 2) the witnesses' degree of attention; 3) the accuracy of the witnesses' prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time elapsed between the crime and the confrontation. *Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253. Another factor affecting the reliability of an identification is the prior familiarity the witness has with the accused. *See People v. Gissendanner,* 48 N.Y.2d 543, 552, 423 N.Y.S.2d 893, 399 N.E.2d 924; *People v. Tas,* 51 N.Y.2d 915, 434 N.Y.S.2d 978, 415 N.E.2d 967. Prior acquaintance may rule out the need for the due process test. *See* Sobel, *Eyewitness Identification,* (2d ed. 1984).

Although it has been pointed out that one-on-one show-ups are suggestive, *Stovall v. Denno,* 388 U.S. 293 at 302, 87 S.Ct. 1967 at 1972, 18 L.Ed.2d 1199 (1967), under the totality of the circumstances in this case, the procedure was not so unnecessarily suggestive as to amount to a denial of due process. An examination of the record shows that reliability was present in this case.

■ The facts that Wolneck knew Minetos previously, that they had been acquainted for a year prior to the robbery,

and that Wolneck had spoken to Minetos earlier in the evening, are factors which all contribute to the overall reliability of Wolneck's identification of Minetos. As part of the totality of the circumstances this prior acquaintance bolsters the reliability of Wolneck's identification of petitioner.

Considering the five factors as set forth in *Manson* and *Biggers, supra*, it appears that Wolneck had several minutes to view his assailant at close range in a well-lit room, including at least one minute when they were face to face. Even though the intruder was masked, Wolneck could still observe his physical build, bearing and way of moving. In *Holland v. Perini*, 512 F.2d 99 (6th Cir.1975). Even though the initial identification involved a one-on-one show-up where the witness observed the armed robber for forty-five seconds at a distance of eight feet at the scene of the crime and less than one day intervened between the crime and pretrial confrontation, it was found that the one-on-one confrontation was not impermissibly suggestive. These aspects of *Holland* are similar to the case at bar, where in addition the robber's voice, which lost its disguising southern accent as the robbery progressed, was also an observation supporting reliable subsequent identification.

The fact that Wolneck complied with the assailant's directions and answered his questions indicates that Wolneck's attention was focused on the intruder. Victims of crime, unlike casual observers, have a special incentive to closely observe and retain an image of the perpetrator. *Neil v. Biggers*, 409 U.S. at 200, 93 S.Ct. at 382, *citing United States ex rel. Phipps v. Follette*, 428 F.2d 912, 915 (2d Cir.1970). Wolneck testified that although he was upset at the time, the situation made him more alert. It thus appears that Wolneck's level of attention at the time of the incident contributed to the degree of reliability.

Shortly after the robbery, Wolneck described the assailant to police as "a male, thirty to thirty-five years of age, one hundred seventy to one hundred eighty pounds, wearing a blue jacket, a pair of light-colored pants and brown shoes, and with a 'put-on' southern accent." This description was sufficiently detailed and accurate to support Wolneck's identification of petitioner independent of the show-up. At the police station, after being given a standard introduction to make a careful identification, Wolneck readily identified Minetos. The procedure took place only several hours after the initial incident. Both of these factors comport with the indicia of reliability as set forth in *Manson* and *Biggers*.

Under these circumstances, we conclude that the identification of Minetos was reliable and that the show-up procedure did not create a substantial likelihood of irreparable misidentification. Even if the one-on-one show-up may have contained aspects of suggestiveness, considering the five factors enunciated in *Manson* and *Biggers*, and the fact that Wolneck and Minetos were previously acquainted, the in-court identification was independently reliable and so was admissible at trial.

For the foregoing reasons, Minetos' petition for a writ of habeas corpus is denied.

IT IS SO ORDERED.