*633 OPINION OF THE COURT
Richard Lee Price, J.
The defendant is charged with various crimes including the murders of his wife and 13-year-old stepdaughter and the attempted murders of his 9-year-old stepson and 7-year-old son. Both the stepson and son will be witnesses for the prosecution as they are supposed eyewitnesses to the two murders and the attempts. Thus, the testimony of the children is being offered as direct evidence of guilt.
On May 3, 1988 both children appeared before this court and, after a full hearing, were qualified, pursuant to CPL 60.20, to give sworn testimony.
The murders took place on March 9-10, 1987. The proposed witnesses were turned over to the care of the Bureau of Child Welfare (hereinafter referred to as BCW) on March 10, 1987 and a file was created which contains, among other things, statements taken from the children describing what happened on the night of the murders. In addition, on April 1, 1987, the stepson began a course of psychiatric treatment at Harlem Hospital’s psychiatric unit. Those records also contain statements of the stepson pertaining to the murders.
Defense counsel served a subpoena duces tecum on Harlem Hospital for the production of the proposed witness’ psychiatric treatment records. Counsel for Harlem Hospital moved to quash the subpoena (CPLR 2304) on the grounds that the records were confidential and, if used for cross-examination of the patient, would have a chilling effect on his ability to freely confide in his therapist and would, consequently, hinder his progress in therapy. The Assistant District Attorney made similar arguments in support of the application.
In opposition to the application, defense counsel argued that his ability to cross-examine the proposed witness, in light of his age and experience, would already be severely curtailed. Thus, counsel stated, he should be permitted to view the records and cross-examine the witness with information contained therein. He argued that the interests of justice, especially in light of the severity of the charges against his client, would be best served by open disclosure of the records.
It should be noted that both counsel for Harlem Hospital and the Assistant District Attorney represented to the court that they had not reviewed the records in question so as to preserve their confidentiality.
A second subpoena duces tecum was served upon BCW for *634 production of their records concerning both children. Counsel for BCW appeared and also moved to quash the subpoena on the grounds of confidentiality. The Assistant District Attorney argued in kind. Defense counsel opposed the application but asked only for those portions of the records "which would impact upon the testimony here”. This qualification is of no moment as all evidence, in order to be admitted, must first pass the test of relevancy, which could easily be defined as any evidence that would impact upon the testimony.
Defense counsel’s only articulated purpose in seeking, and using, these records was to attack the credibility of the witnesses with any inconsistent statements the records may contain.
In order to accommodate the competing interests of the defendant in his quest to conduct a full and unfettered cross-examination and the witnesses’ expectation that their BCW and psychiatric treatment records were confidential, this court, preliminarily, denied the motions to quash but received the contested records for the purpose of conducting an in camera inspection, a procedure authorized by CPL 240.90 (3). (Also see, People v Price, 100 Misc 2d 372 [Sup Ct, Bronx County 1979].) This conclusion, however, could not have been reached without an analysis of the arguments of counsel, to wit, whether the subpoenaed records are, indeed, confidential and, if so, what was the scope.
Section 33.13 of the Mental Hygiene Law clearly cloaks the psychiatric treatment records of the stepson with a veil of confidentiality:
"§ 33.13 Clinical records; confidentiality * * *
"(c) Such information about patients or clients reported to the offices, including the identification of patients or clients, and clinical records or clinical information tending to identify patients or clients, at office facilities shall not be a public record and shall not be released by the offices or its facilities to any person or agency outside of the offices except as follows:
"1. pursuant to an order of a court of record requiring disclosure upon a finding by the court that the interests of justice significantly outweigh the need for confidentiality, provided, however, that nothing herein shall be construed to affect existing rights of employees in disciplinary proceedings.”
On its face, therefore, the confidentiality conferred is not *635 absolute if the need for confidentiality is significantly outweighed by the interests of justice.
When analyzing the purpose for bestowing confidential status upon the Harlem Hospital records the court was guided by CPLR 4504, which defines the statutory privilege protecting a patient’s records from disclosure by his or her physician:
"§ 4504. Physician, dentist and nurse
"(a) Confidential information privileged. Unless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing, or dentistry shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity. The relationship of a physician and patient shall exist between a medical corporation, as defined in article forty-four of the public health law, a professional service corporation organized under article fifteen of the business corporation law to practice medicine, and the patients to whom they respectively render professional medical services.”
CPLR 4504 is a rule of evidence which reflects the Legislature’s intention to encourage full and open communication of all information to the physician without fear of disclosure. (Steinberg v New York Life Ins. Co., 263 NY 45 [1933]; Edington v Mutual Life Ins. Co., 67 NY 185 [1876].) The facts of a person’s medical history are not protected; rather it is the confidential communications made by the patient to the physician that are privileged. (Williams v Roosevelt Hosp., 66 NY2d 391 [1985].) In the content of psychiatric treatment records, where the treatment revolves solely around confidential communications made to the therapist, the physician/patient privilege would protect the records in their entirety.
The physician/patient privilege as defined in CPLR 4504 is made applicable to criminal proceedings by virtue of CPL 60.10, which states:
"§ 60.10 Rules of evidence; in general
"Unless otherwise provided by statute or by judicially established rules of evidence applicable to criminal cases, the rules of evidence applicable to civil cases are, where appropriate, also applicable to criminal proceedings.”
In the case of children, in general, and this child in particular, maintaining the confidentiality of the communications of the patient made to his or her therapist is of paramount importance for the patient’s progress in therapy. The in *636 camera review of the psychiatric records revealed that the stepson was able to fully disclose his thoughts and feelings only after a relationship of trust had developed between himself and his therapist. In support of the application, the hospital has submitted a letter to the court from Dr. Eleanor Townsend, a psychiatrist and the director of the Harlem Center for Child Study. This letter contains the opinion of the author that "In order to maintain the effectiveness of this treatment, it is necessary that confidentiality be maintained so that he [the witness] knows that he may speak freely without fear that others will know what he says.”
The records further revealed the child’s anxiety about testifying and, specifically, that he was afraid that the defendant would use fear tactics to prevent him from telling the truth. Two illustrative entries in the chart dramatically depict the child’s concerns. An interview conducted on April 25, 1988, prior to the date upon which the witness was to appear before the Grand Jury, reflects the child’s "fear that [his] father would break free of [the] guards and kill him”. Of course, the defendant was not present during the Grand Jury proceeding; the records of the stepson’s session conducted after he testified revealed the child’s relief at the absence of the defendant. On May 4, 1988, immediately after he testified at the qualification hearing he stated to his therapist that "daddy is making faces at me to try to stop me from telling the truth”. It was his therapist’s impression that the witness was "a very frightened little boy right now”.
The character of the BCW records are somewhat different from the psychiatric treatment records because the focus of BCW is placement of the children, rather than their individual therapy. The BCW records do, however, contain dramatic statements of both children when relating the events of the night of the murders. With their mother dead, and having heard the children recount their observations of the defendant’s return to the apartment that contained the dead bodies of the victims where he turned on the gas stove and left a lit cigarette at or near the stove, BCW charged the defendant with child abuse and maltreatment. The goals of BCW are distinct from those of the Harlem Hospital psychiatric unit. The Social Services Law also mandates that they, too, are confidential:
"§ 422. Statewide central register of child abuse and maltreatment * * *
*637 "4. * * * Reports made pursuant to this title as well as any other information obtained, reports written or photographs taken concerning such reports in the possession of the department or local departments shall be confidential and shall only be made available to * * * (e) a court, upon a finding that the information in the record is necessary for the determination of an issue before the court”.
Also see, Social Services Law §§ 460-e and 444, which state, in pertinent part:
"§ 460-e. Records and reports; confidentiality; information * * *
"2. The department may request from any other state department or state or local agency, including the department of mental hygiene, the division for youth and the board of social welfare, and such other department or agency shall furnish, such information as the department may require for the proper performance of its duties under this article. The department shall safeguard the confidentiality of information received from such departments and agencies. Such other state departments or state agencies may request from the department, and the department shall furnish, such information as such other department or agency may require for the proper discharge of its duties. Such departments and agencies shall safeguard the confidentiality of such information, records, and reports in the same manner as the department in accordance with the provisions of sections one hundred thirty-six and four hundred forty-four of this chapter.”
"§ 444. Confidentiality of records; related matters.
"1. The department in consultation with the advisory committee shall make regulations;
"(a) protecting the confidentiality of individual identifying information submitted to or provided by the service, and preventing access thereto, by, or the distribution thereof to, persons not authorized by law”.
Other types of statutorily confidential Social Services Department records have been withheld from disclosure to a criminal defendant. (See, e.g., People v Graydon, 70 Misc 2d 336 [Nassau County 1972] [public assistance records].) Also see, Matter of Carla L. (45 AD2d 375 [1st Dept 1974]) which held that foster care records were confidential and, when sought by the natural parent in a foster care review proceeding, were not discloseable except for in camera review by the court.
*638 Thus, both the psychiatric treatment records and the BCW records are confidential and subject to review by the court in order to determine whether any parts thereof are to be released to the defendant.
As quoted above, the statements made by the stepson to his therapist poignantly portray the child’s dilemma in wanting to testify to the truth versus his fear of retaliation from the defendant, his stepfather, and his anxiety at recounting, in an unfamiliar and intimidating setting, the horrendous details of the murders of his mother and sister. On the whole, the chart reflected the commendable progress the stepson has made in his year of therapy. This court, therefore, is most interested in protecting this witness and ensuring that his participation in the trial of his stepfather will, in no way, result in a regression in his therapy or otherwise impact upon the child’s fragile mental state.
On the other hand, the defendant, who stands accused of the most serious crimes, has an undeniable interest in confronting and cross-examining this witness with all relevant information. This right of confrontation is guaranteed under both the Sixth and Fourteenth Amendments of the US Constitution and has been treated as paramount to numerous competing interests.
In Davis v Alaska (415 US 308 [1974]), the right of confrontation outweighed the State’s interest in preventing cross-examination of its witness by use of his otherwise confidential juvenile record. Apparent from the Davis decision was the court’s interest in the articulated purpose for delving into the records in question. In that case, the permitted purpose was "[t]he introduction of evidence of a prior crime” in order to "attack * * * the witness’ credibility * * * by * * * revealing possible biases, prejudices, or ulterior motives of the witness” (415 US, at 316).
Adopting the method of analysis used in the Davis decision, the courts in this State have, in certain instances, permitted disclosure of confidential records when, after balancing the competing interests, the right of confrontation outweighed the need for confidentiality. The issue that most closely resembles that presented by the application herein involves defense requests for disclosure of a witness’ psychiatric records where the witness’ mental condition is an issue at the trial. In Civil Serv. Employees Assn. v Soper (84 AD2d 927 [4th Dept 1981]), the petitioner, an employee of a developmental center, was *639 accused of acts of misconduct involving alleged patient abuse. A patient at the center was called to testify against the accused in order to corroborate the testimony of another witness. Petitioner questioned this witness’ mental competence and demanded production of the proposed witness’ mental health treatment records. The arbitrator acceded to the demand and conditioned receipt of the witness’ testimony upon disclosure of her medical records. Respondent refused to produce the records and the witness was not permitted to testify. On appeal, the court upheld the arbitrator’s decision finding, inter alia, that where the proposed witness’ mental state might affect his or her credibility, the confidentiality of the medical records must give way to the accused’s right to confront the witness: "The medical file is particularly critical in a case such as this because the witness concededly suffers from some type of a mental disease or defect. Although such person’s competency as a witness may be proved by an examination of her present alertness and memory, the contents of her medical file may well prove crucial to the determination of her credibility and the state of her mental powers and faculties at the time of the incident. The records would be indispensable to effective cross-examination.” (84 AD2d, at 928; to the same effect, see, People v Baier, 73 AD2d 649 [2d Dept 1979]; People v Lowe, 96 Misc 2d 33 [Crim Ct, Bronx County 1978]; People v Freshley, 87 AD2d 104 [1st Dept 1982].)
Thus, based upon the above authority, we know that the interest in maintaining the confidentiality of mental health records is secondary where the witness’ mental competence, at the time of the event he or she is testifying about, may affect the witness’ credibility. We also know, however, that there are other circumstances where the confidentiality of certain records will not be overcome if the articulated purpose for disclosure is something other than an attack on credibility by showing mental incompetence. In People v Gissendanner (48 NY2d 543 [1979]), the defendant, accused of the criminal sale of cocaine, sought the production of the police personnel files of the two officers involved in the "buy and bust” operation. The articulated purpose for disclosing these otherwise confidential records was "to 'find material appropriate for cross-examination when the officers testify’ ” (at 547). In upholding the trial court’s denial of disclosure of the records sought, the Court of Appeals reasoned that "[E]ntitlement to access on no more than a bare allegation that the inspection is sought as fodder for an untracked attack on credibility would render the *640 principle of confidentiality meaningless for all practical purposes.” (48 NY2d, at 549-550.) Similarly, in Cloud v Thomas (627 F2d 742 [5th Cir 1980]) the confidentiality of the arresting officer’s personnel file was maintained even though the articulated purpose for its disclosure was for the specific purpose of attacking his credibility with information contained therein that would establish that the officer had "filed a false report in an unrelated 'vice undercover operation.’ ” (Supra, at 743.) Under authority of Davis v Alaska (415 US 308, supra), the court denied the defendant’s application because the reason given for the evidence sought was not to establish "any incentive the witness may have to falsify his testimony”. (Supra, at 744.) Instead, the argument in support of disclosure was the defendant’s desire to argue to the jury that having once lied the witness may now be lying again. (Supra.) Thus, the court upheld the trial court’s refusal to disclose the confidential material sought because it did not affect the witness’ credibility "with respect to the specific events of the crime charged”. (Supra, at 745.) Similar efforts to obtain confidential records which would not establish that the witness was motivated to testify falsely have been denied: People v Prim (40 NY2d 946 [1976] [Social Services Department interoffice memoranda]); People v Norman (76 Misc 2d 644 [Sup Ct, NY County 1973] [police personnel records]).
Returning to the issues presented in the case at bar, defense counsel’s only purpose for obtaining the records in question was to impeach the witness’ credibility by introducing prior inconsistent statements. Unlike Civil Serv. Employees Assn. v Soper (84 AD2d 927, supra), neither witness has a history of mental incompetence so no attack could be made inferring that their mental condition at the time of the murders was suspect. Unlike Davis v Alaska (supra) and People v Gissendanner (supra), the defense is not attempting to use the contents of the confidential records to show that the witnesses are motivated to testify falsely to the events. Be that as it may, attacking the credibility of a witness by using prior inconsistent statements is an accepted method of impeachment. (People v Rosario, 9 NY2d 286 [1961].) Under the authority of Rosario, any pretrial statement of a witness must be disclosed even if it seems to be "in harmony” with the proposed testimony. (Supra, at 289.) However, if the documents contain confidential material defense counsel may not gain open access: "As long as the statement relates to the subject matter of the witness’ testimony and contains nothing *641 that must be kept confidential, defense counsel should be allowed to determine for themselves the use to be made of it on cross-examination.” (People v Rosario, supra, at 289.)
Thus, in the case of disclosure of confidential records for the purpose of impeachment with prior inconsistent statements, the court must intervene and balance the competing interests of the need for confidentiality and the right of confrontation. The defendant must be denied open access to the records in favor of maintenance of their confidentiality. Rather than allowing defense counsel to determine, from his review of the records, whether they contain any inconsistent statements, the court must become the arbiter of the issue and determine, on its own, whether any such information is contained in the records sought. Thus, it was this court’s task to carefully and objectively review the records and segregate those statements that may arguably be seen as inconsistent with the proposed testimony. Naturally, defense counsel, if allowed to view the records himself, may disagree with the court’s opinion of what constitutes an inconsistent statement, especially in the case of seemingly inconsistent statements which, when read in the over-all context, do not appear to be inconsistent at all.
The in camera review undertaken by this court would have been solely limited to the identification of any inconsistent statements contained in the records were it not for the agreement of the prosecution that any Brady material contained therein should, in the spirit of fairness, be turned over.
The landmark decision of Brady v Maryland (373 US 83 [1963]) obligates the prosecution to turn over to the defendant, upon his or her request, evidence which "would tend to exculpate him or reduce the penalty” (supra, at 88; also see, CPL 240.20 [1] [h]). Neither group of records sought would normally fall under the umbrella of Brady since they were not "records within the possession, custody or control of the District Attorney”. (People v Price, 100 Misc 2d 372, 381, supra; to the same effect, see, People v Prim, 40 NY2d 946, supra.)
Thus, looking for Brady material and any inconsistent statements, the BCW and Harlem Hospital psychiatric records were carefully reviewed many times by this court. The psychiatric records contain neither exculpatory material nor any statements inconsistent with the stepson’s Grand Jury testimony; in fact, from the beginning of his treatment right up until the last relevant entry on May 4, 1988, the stepson *642 consistently declared his stepfather, the defendant, to be the murderer of both victims and the perpetrator of the attempted murders of himself and his half brother. The only document which contained arguably inconsistent material was a report of the BCW caseworker, apparently incorporated into the Harlem Hospital records, taken on March 24, 1987, which states, in pertinent part: "According to [the stepson], he [the defendant] was using drugs on that day (3/10/87) and he was not sure of what happened but he did not try to help the mother. There were screams and the elder sister went to help the mother. The mother and the elder sister were killed, how, he could not tell. He saw the father leaving on the bus and he called the police. He and his younger brother were very scared and stayed under their bed covers until the father left.”
After weighing the competing interests, this court determined that the contents of the statement as quoted above could be read to the jury and referred to during the cross-examination of the stepson. The document itself may not be used nor may defense counsel refer, in his cross-examination, to the fact that the witness was undergoing psychiatric treatment. This compromise seemed to this court to be the most reasonable in that the statement would be heard by the jury and defense counsel could inquire of the witness as to its contents and sum up with regard to its inconsistent nature while maintaining the spirit of confidentiality in that the witness would continue his open discussions with his therapist without fear of disclosure and confrontation.
The latter part of this caseworker’s report contained an assessment of the stepson’s mental status at the time of the interview that might be helpful to the jury in determining the weight the statement would be given: "He [the stepson] related fairly well but showed reluctance and inhibition in the beginning. He understandable [sic] refused to talk about the murder in the beginning but was able to give a sketchy information about the murder as the interview progressed and he was drawn into playing.”
This statement will also be read to the jury if the main statement is used since, without it, the main statement would lack context. The remainder of the Harlem Hospital records were sealed.
The BCW records contain, in addition to the report referred to above, one further potentially inconsistent statement found in a psychological evaluation report dated March 19, 1987, which states, in pertinent part:
"Chauncy directly described his recollections within his *643 figure drawings. He drew a picture of 'Thalima’ and reported, 'My sister was choked, and my mother had blood and black mark scratches on her face. Then me and my brother called 911. I did not have tears in my eyes. I called 911, but I didn’t tell on him. He didn’t do nothing bad, but police came and got him and took him away forever. He was on drugs. I don’t get nightmares’. Asked what would happen with Thalima, after he acknowledged she was dead, Chauncy explained, 'She’s going to get sawed up. They’ll cut her chest up and sew her back up and she’ll be alive again, but my mother, she ain’t never coming alive again because of her face’. He also drew a house in which 'everybody’ lived, but 'not father. He was thrown out. He was out in the streets. My mother told him never come back, but he came back everyday until the last. But he didn’t get us because we were hiding under the covers and he said where are those kids?’
"He seemed ambivalent and confused in his emotional reactions, and desires pregarding [sic] his father. Soon after stating that he didn’t want his father to get in trouble 'because he didn’t do nothing’, he stated that he 'told them (police) to hang onto him until he knew what was good for himself.
"In summary, Chauncy seems to be confused and emotionally overwhelmed in his reactions to the murders he describes in graphic detail. He seems to have prevented this experience from impairing his behavior and social functioning, however. The most appropriate summary statement of Chauncy’s status seems to be that he’s a 6 year old boy with a catastrophic trauma, but who appears to remain quite functional.”
The contents of the remainder of the BCW records were consistent with the witness’ proposed testimony and will be sealed when a certified copy is delivered to the court, as ordered, since it was the original record that was produced for the in camera inspection.
While the defendant’s right of confrontation has been, to some extent, limited by this court’s decision, under all of the circumstances before the court, it is determined that the interests of justice are best served by maintaining the confidentiality of the records in question while allowing the jury to hear those portions remotely favorable to the defendant. Oftentimes striking a delicate balance between competing significant interests can and must be accomplished without substantially compromising anyone’s rights.