THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM SIMMONS, Appellant.

First Department, August 1, 1991

## APPEARANCES OF COUNSEL

*Anastasios Sarikas* of counsel *(Sarikas & Hanna,* attorneys), for appellant.

*Donna Krone* of counsel *(Robert M. Raciti* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

Carro, J. P.

On September 5, 1985, at 5:00 A.M., Police Officers Albert Skorupa and Richard Mascaro responded to a radio call of a person in need of medical assistance at the Metro Baptist Church located at 410 West 40th Street in Manhattan, and found Deborah Graham lying nude and unconscious at the top of the church steps, in a pool of blood, her skull fractured from repeated blows to the head with a blunt instrument.[1] As the officers were inquiring of several homeless people in the

---

1. Ms. Graham died two weeks later in a hospital, never having recovered from a coma induced by the beating.

area whether they had any information regarding the incident, and receiving negative responses, the defendant approached the officers and volunteered that he was the person who called the police, and that he had come back to see if the injured woman was all right. Defendant further volunteered that while he was talking to a "bag lady" across the street from the church, he had seen a man strike the victim on the head several times and then run away. That man was described as black, 5-feet 5-inches tall, in his late 20's, and wearing a red shirt. The defendant appeared very cooperative, and said he would tell what he had seen to detectives. Neither officer made notations of defendant's statement in their memo books because they assumed he would be repeating his story to detectives.

At 8:00 A.M., the defendant accompanied uniformed officers to the Tenth Precinct Detective Unit, where he was interviewed by Detective Peter Canarelli. The defendant did not tell Canarelli that he had seen the attack on Ms. Graham, but rather related that at 3:30 A.M. he had gone to the church seeking a pair of shoes, his having been stolen while he was asleep in front of a Times Square adult theater. He said that upon arriving at the church, he saw a woman he had seen many times before, lying in a pool of blood, and a man sleeping next to her. This man was described as black, with a mustache, and wearing a red shirt and khaki pants. Detective Canarelli asked defendant whether he could take a Polaroid picture of him, since he lived on the street, and the detective would not otherwise be able to locate him if needed. The defendant agreed to have his photograph taken, and also agreed to notify Detective Canarelli if he again saw the man who was sleeping next to Ms. Graham.

On Saturday, September 7th, Ellen Murath Schneider telephoned the Tenth Precinct to report that she had witnessed the attack at the church, which was directly across the street from her apartment. The desk officer told her that Detective Canarelli was off duty until Monday, and that he would contact her. On Monday, September 9th, Detective Canarelli telephoned Ms. Schneider, and she told him that at 2:30 A.M. on September 5, she had seen the assault committed by a black male, 30 to 35 years old, 5-feet 10-inches to 6-feet tall, of medium weight (about 160 pounds), with hair of medium length, wearing blue jeans and a T-shirt (possibly blue) with

stripes.[2] She also said she had seen the man many times on her block, occasionally with the victim, and that she would know the man if she saw him again. Detective Canarelli asked her if he could show her some photographs, and she agreed to view them at her apartment. Canarelli then prepared an array of six photographs in a folder which revealed only the subjects' faces and shirt collars.

█ Defendant claims that this photo array was somehow geared to suggest picking his photograph, number 2, but we have examined the array and find it to be eminently fair. If anything, the array might arguably be suggestive of picture 5, the one sepia-toned photo, or possibly picture 6, the only subject not looking directly into the camera. The only features possibly distinguishing the defendant are that he was the oldest person in the array, although not to a significant degree, judging from their appearances, and he was the only one with a small patch of white hair, which was not one of the features related to Detective Canarelli on the phone. In this regard, the courts have repeatedly held that there is no requirement that all the participants in a lineup or photo array appear to be identical in appearance; rather, all that is required is that they resemble each other sufficiently so as not to create a "substantial likelihood" that the defendant would be singled out for identification (*People v Chipp,* 75 NY2d 327, 336; *People v Mason,* 138 AD2d 411, *lv denied* 72 NY2d 863; *People v Rodriguez,* 124 AD2d 611; *People v Scott,* 114 AD2d 915).

Ms. Schneider viewed the array in her apartment, without having been told that it contained a photograph of a suspect. She immediately recognized the defendant, and said "that's the guy who hit her four times," or, as Canarelli noted on the back of the array, "that's the one with the stick in his hand, I saw him hit her four times." Ms. Schneider was told to look at the photographs again to be absolutely sure. She did, and was still sure that defendant was the man who had attacked Ms. Graham.

█ Defendant was arrested on the morning of September 11th at the Port Authority Bus Terminal. When defendant was told he was going to be placed in a lineup, he became violent, and he was handcuffed. However, the number card was held by him in such a way as to conceal the handcuffs.

2. Defendant was 42 years old, 6-feet 2-inches tall, weighed 175 pounds, and had short to medium-length hair.

Ms. Schneider testified that she never saw the handcuffs, but rather identified the defendant because she recognized him as the attacker. We have examined a picture of the lineup and conclude that it was fairly constituted, and that the handcuffs were not visible. Ms. Schneider was positive in her identification of the defendant both at the lineup, and at trial.

It should be noted that Ms. Schneider, who lived in a second-floor apartment directly across from the church, first met the defendant on Memorial Day weekend of 1985, when she was walking her dog in the minipark. Her dog ran into the defendant on that occasion, and she approached him and apologized. Subsequently, Ms. Schneider noticed defendant in the area 3 to 5 times a week during the summer of 1985. About twice a week while walking her dog, she saw defendant in the neighborhood minipark, which was so small that they were no further than six feet apart. She also noticed defendant sleeping on the side church steps between 6 and 10 times over the summer. Thus, her identification of the defendant was essentially a confirmation of her recognition of a person already known to her, and "suggestiveness" is only a minor concern. *(See, People v Gissendanner,* 48 NY2d 543, 552; *People v Tas,* 51 NY2d 915.)

At trial, Ms. Schneider testified that she arrived on her block at 2:30 A.M. after working late, and saw defendant, carrying a three-foot pipe or stick, walk up the church steps toward Ms. Graham, who was sitting at the top of the steps. In the light of two streetlamps, she saw defendant strike Ms. Graham on the head four times. Thinking this was merely an incident of two "street people" fighting, Ms. Schneider went up to her apartment, leashed her dog, and returned to the street about a minute later. Defendant was then standing over his victim, who was lying motionless on her back. No one else was on the street. When Ms. Schneider returned to the scene about a minute later, after walking her dog, she saw a man, whose face was then obscured by a beige blanket, lie down on top of Ms. Graham. Ms. Schneider returned to her apartment, and immediately looked out her window at the church, a distance of 66 feet. She observed the man, under the blanket but on top of Ms. Graham, making "back and forth" lower body movements.

■ Defendant claims that the evidence of attempted rape was entirely circumstantial, and did not exclude to a moral certainty every reasonable hypothesis but guilt *(People v Benzinger,* 36 NY2d 29, 32). We disagree. The evidence must

be viewed in the light most favorable to the People, and the jury's conclusion, that defendant was attempting to rape Ms. Graham when he was seen lying on top of her unconscious body, and making back and forth movements, flows naturally from the proven facts, and excludes every reasonable hypothesis except guilt *(People v Kennedy,* 47 NY2d 196, 202). Defendant also urges the possibility that someone other than he raised the victim's dress up to her neck during the 2½ hours between the attack and the arrival of the police. There was no evidence to support this view, and the jury rejected this speculative hypothesis, as it had every right to do. *(See, People v Bruce,* 162 AD2d 604, *lv denied* 76 NY2d 853; *People v Troy,* 119 AD2d 880.)* Significantly, Ms. Schneider observed the defendant making fast movements with his shoulders and arms just prior to commencing the back and forth lower body movements, and the jury could logically have concluded that defendant was then pushing Ms. Graham's dress up to her neck.

Defendant argues that Officer Mascaro's testimony of the defendant's statement volunteered at the scene was improperly admitted because the People did not serve upon defendant a notice of their intention to use the statement at trial as required by CPL 710.30. CPL 710.30 (3) provides: "In the absence of service of notice upon a defendant as prescribed in this section, no evidence of a kind specified in subdivision one may be received against him upon trial unless he has, despite the lack of such notice, moved to suppress such evidence and such motion has been denied and the evidence thereby rendered admissible as prescribed in subdivision two of section 710.70."

There was a *Huntley* hearing *(People v Huntley,* 15 NY2d 72)* held with respect to defendant's statement to Officer Skorupa, and the court properly determined that the statement was admissible because it was volunteered, and there was not the slightest doubt that defendant was not in custody at the time it was made. Significantly, at the conclusion of the *Huntley* hearing defense counsel did *not* urge that the statement was suppressible on any constitutional grounds, but rather only urged that the People had not met their "burden to prove beyond a reasonable doubt at this hearing that the Statement was in fact made." That, of course, is not the pertinent issue at a *Huntley* hearing, but is rather a question to be determined by the jury at trial. Officer Skorupa testified at the hearing that defendant approached "us", that is himself

and Officer Mascaro, and volunteered the statement that he saw a black male, dressed in red, assault Ms. Graham and then flee. Defendant made the identical statement to Officers Skorupa and Mascaro, at most minutes apart, and thus the hearing court's finding of voluntariness of the statement to Officer Skorupa (who did not testify at trial) unquestionably applies as well to the statement made to Officer Mascaro which was admitted at trial.

We note there was no element of surprise herein since Mascaro had testified regarding the volunteered statement at an earlier trial, which ended in a mistrial. The court, by written decision dated April 16, 1986, had denied defendant's motion to preclude introduction of the "statement alleged to have been made by the defendant to the first *officers* on the scene" (emphasis added). Moreover, at trial, which commenced on June 19, 1986, defense counsel conceded that he had actual notice of defendant's statement to Mascaro. *People v O'Doherty* (70 NY2d 479) is distinguishable, since in that case the trial court had held a *Huntley* hearing over defendant's objection, whereas in the case before us the defendant voluntarily moved, by notice of motion returnable December 5, 1985, and again by notice of motion returnable March 24, 1986, to suppress his statements made to the police. His motion was denied after a hearing, thus bringing into play CPL 710.30 (3), which creates an exception to the exclusionary rule in such circumstances.

▮ Even if admission of defendant's statement to Officer Mascaro were found to be error under CPL 710.30, the error was harmless. Defendant was positively and unhesitantly identified as the murderer by a disinterested witness, who knew his face from numerous observations over an extended period of time, and who observed him under excellent lighting conditions just prior to the attack. *(See, People v White,* 73 NY2d 468, 476; *People v Stridiron,* 155 AD2d 247, 248, *lv denied* 75 NY2d 776; *People v Brown,* 140 AD2d 266, 270, *lv denied* 72 NY2d 955.)* In *People v O'Doherty (supra,* 70 NY2d, at 489), the Court of Appeals rejected a harmless error finding where a robbery victim who did not know his assailant initially described her as an Hispanic, 5-feet, 4-inches tall, with a medium complexion and a Puerto Rican accent, whereas the defendant was 5-feet, 7-inches tall, light-skinned, of Irish descent, and spoke with no accent. We thus find that there is no reasonable possibility that defendant would have been acquitted if the statement to Officer Mascaro had not been

introduced at trial. Moreover, the conduct of the defense, and defendant's trial strategy which sought to lay blame on the man in red, described by defendant to Detective Canarelli, would not have been different if the statement had not been introduced at trial.

■ Defendant's motion to suppress identification testimony was properly denied. *(See, People v Adams,* 53 NY2d 241.) Since testimony concerning the lineup was first introduced by defendant on cross-examination of Ms. Schneider, defendant cannot now complain about its introduction. Giving due consideration to Ms. Schneider's familiarity with defendant's features *(People v Collins,* 60 NY2d 214, 219), we conclude that any elements of the identification procedures that might have been less than ideal did not create any risk of misidentification at trial.

■ During cross-examination of Detective Canarelli, defense counsel asked the detective for defendant's actual age, weight and height, and the detective replied that since he did not have his notes in front of him he would have to look at the "rap sheet". Upon defense counsel's motion for a mistrial, the court advised counsel that it would attempt to cure any prejudice by asking the detective whether he prepared a document containing defendant's height and weight, and whether the document is referred to as a "rap sheet", and that was accomplished. The prosecutor followed up by eliciting from the detective that in connection with every arrest a document is prepared listing the arrested person's height, weight, race and Social Security number, that the document is referred to as a "rap sheet", and that this is what the detective referred to when he made his initial comment. We conclude that the actions by the court and prosecutor adequately cured any prejudice that might have resulted from the detective's initial remark.

■ Finally, defendant argues that he should have been permitted to introduce into evidence a report prepared by Detective Canarelli memorializing his interviews with two homeless women, Earline Gibbs and Maxine Johnson, who had mentioned a short, dark-skinned man who had approached Ms. Graham at the top of the church steps. Johnson did not see the man assault Ms. Graham, but Gibbs told the detective that she saw the man hit Graham on the head with an oval object resembling an ice pick, jump on her, have sex and leave after 15 minutes. The court ruled that the content of those statements would clearly be hearsay, and that the

prosecutor would have had no opportunity to cross-examine with respect to the truth of those statements. Defense counsel asserted that he was only trying to introduce the statements to show that Detective Canarelli was biased against the defendant in that he did nothing to pursue that lead, electing instead to consider the case closed upon Ms. Schneider's identification of defendant as the attacker.

We believe that the trial court appropriately exercised its discretion in excluding the contents of the report prepared by Detective Canarelli, as the hearsay component would have been extremely prejudicial to the People, and it was essentially immaterial to any demonstration of bias on the part of the detective. Defendant's remaining claims are either unpreserved or without merit.

Accordingly, the judgment of the Supreme Court, New York County (Joan Carey, J., at hearing and trial), rendered October 1, 1986, convicting defendant of murder in the second degree and attempted rape in the first degree, and sentencing him to concurrent, indeterminate terms of imprisonment of 20 years to life and 5 to 15 years, should be affirmed.

MILONAS, ROSENBERGER and KUPFERMAN, JJ., concur.

Judgment, Supreme Court, New York County, rendered on October 1, 1986, unanimously affirmed.