OPINION OF THE COURT
Franklin R. Weissberg, J.
The defendant has moved to suppress an identification secured as the result of an unusual video tape procedure which he claims was violative of his constitutional rights. He also seeks to suppress statements allegedly made by him as improperly elicited. At a hearing held before me on August 24, 1987, the People presented testimony from a housing police officer, Edward May. The defendant did not testify, or call any witnesses.
I find the testimony of the officer credible, and I make the following findings of fact:
On the evening of April 6, 1987 Bridget Flowers met a man whom she had seen before in the neighborhood but did not know by name. They began to talk and walk together. After they had gone about four blocks, they came to a building, 2199 Fifth Avenue, which the man entered alone. Soon thereafter, he appeared at a top floor window and asked her to come up. She did so, and when she arrived at that floor, he demanded that she have sex with him. When she refused, he began choking her. She broke free and ran to the roof, but the man caught her and beat her unconscious.
Police officers visited Ms. Flowers on several occasions at the hospital in which she was recovering. She was able to describe her assailant, but she did not know his name. However, she advised the police that she had seen him on a number of occasions. Officer May thereafter obtained a surveillance van equipped with a video camera and a periscope. On the night of April 24, 1987 Officer May and two of his *410 colleagues stationed the van at various locations where the victim had previously indicated seeing her assailant. All of the pedestrian traffic in those areas was videotaped, although particular attention was focused on people who fitted the assailant’s general description. The result of this activity was a 90-minute videotape, containing dozens of people.
The videotape was thereafter viewed by the victim in its entirety at her place of residence by means of a portable VCR and viewer. Officer May testified that the video was shown without sound and that the victim recognized land markings, streets and various people who appeared in the video. When the defendant’s image appeared she promptly and unequivocally identified him.
The defendant was subsequently taken into custody by three anticrime officers. Officer May, who was in the vicinity when the defendant was arrested, arrived shortly thereafter. He took custody of the defendant and transported him to the precinct. While en route, the defendant spontaneously stated, "I don’t know about the girl getting beat up”. The defendant was thereafter given his Miranda warnings, and indicated that he understood his rights. He then agreed to speak to the officer, and gave an inculpatory statement.
I find that the video tape procedure employed by the police officers and the subsequent viewing by the victim were neither suggestive nor prejudicial. The victim did not know her assailant’s name or address. She knew the areas where he might be found but was in no physical condition to accompany the police to those areas. Under such circumstances, the police officers’ decision to videotape pedestrian traffic in those areas was an innovative and sensible use of modern technology.
There was nothing in the manner in which the tape was made and thereafter viewed by the victim that unduly influenced her to identify the defendant. The officers admittedly concentrated the camera’s attention on those who matched the victim’s description of the assailant. The description could apply to many of those who came within camera range. Nothing in a viewing of the tape suggests that the defendant was singled out in any way.
The tape was presented to the victim without prompting. She viewed the tape, and commented from time to time on people she recognized. Her identification of the defendant was immediate and certain when his image appeared on the tape.
The defendant contends that the People should be barred *411 from eliciting testimony at trial about the identification procedure employed because of the limitations imposed by CPL 60.30. That section and its predecessor (Code Grim Pro § 393-b) represent statutory exceptions to the traditional rule in New York that it was reversible error to admit testimony by the witness that he had previously identified an accused in person. (See, e.g., People v Jung Hing, 212 NY 393; People v De Martini, 213 NY 203.)
While the exceptions have been narrowly limited to permitting a witness to testify only to a previous identification by him of the defendant in person, nothing in the plain language of CPL 60.30 mandates a limitation to prior corporeal identifications. The cases which impose the limitation have considered the admissibility of prior photographic identifications (People v Caserta, 19 NY2d 18; People v Lindsay, 42 NY2d 9; People v Cioffi, 1 NY2d 70); or prior composite sketch identifications (People v Griffin, 29 NY2d 91).
The rationale for prohibiting those two types of prior identification procedures is more fear of prejudice than lack of probative value. Thus, in Caserta (supra, at 21) the court referred to the "rogues’ gallery” from which photo identification procedures are generally conducted, and opined that a jury would naturally conclude that anyone so identified had a prior record. Similarly, in Griffin, the composite sketch there proffered was rejected as "prejudicial”. (People v Griffin, supra, at 93.)*
However, CPL 60.30 and its predecessor statute have been construed to sanction trial testimony concerning prior lineup and showup identifications (see, e.g., People v Lindsay, supra).
There appear to be no prior reported cases in this jurisdiction dealing with the appropriateness of trial testimony estab *412 lishing a previous identification from a videotape. Therefore, the question before the court is whether such video tape identifications are more akin to photo or sketch identification procedures, or to lineups and other corporeal identifications.
The videotape in this case was clear and of almost professional quality.
The videotape, unlike the conventional photo or sketch, captures the kind of movement that can show personal characteristics or unique facial or body gestures. The size of the person can be gauged, coloring discerned, distinctive features revealed. Videotaped images are as close as modern technology can bring us to a corporeal identification.
Moreover, the video tape procedure, at least as employed here, carries none of the prejudicial effects of prior photo or sketch identifications. The suggestions of prior criminal conduct (mug shots) or a repeated pattern of criminal behavior (composite sketches) are absent. The videotape captures the defendant, as well as many other people, in the course of normal activity. It contains more people who match the perpetrator’s description than any lineup could. The procedure here was fair and unprejudicial. For all those reasons, I find nothing in CPL 60.30 prevents the People from eliciting on direct examination the fact that a prior extrajudicial identification of the defendant was made by the complaining witness after viewing the videotape.
The defendant’s initial statement to Police Officer May, which occurred after arrest and prior to Miranda warnings, and before any questioning had begun, was spontaneous in nature and was uttered without any apparent external cause. It is admissible. (People v Lanahan, 55 NY2d 711 [1981].)
The post-Miranda statements present different problems, because the People have admittedly failed to provide the defendant with timely notice under CPL 710.30. The People’s failure was inadvertent and was occasioned by the transfer of the matter from one Assistant District Attorney to another and a failure of communication between those attorneys. It is well settled, however, that " Tack of continuity’ ” or other office failure does not constitute "good cause” sufficient to justify late notice. (See, People v Briggs, 38 NY2d 319, 321 [1975].) Although some courts have suggested that late notice should be permitted even absent good cause where the late notice is given prior to trial and where no prejudice occurs (see, for example, People v Brown, 83 AD2d 699 [3d Dept *413 1981]), such a reading of CPL 710.30 seems to contravene the plain meaning of the statute. (People v Oliver, 129 Misc 2d 432 [1985].)
The People may not use on their direct case those statements for which timely notice pursuant to CPL 710.30 was not given.

 Judge Jasen, arguing in his Griffin dissent that a composite sketch identification should be permitted into evidence as a " 'previous identification’ ” sanctioned by section 393-b of the Code of Criminal Procedure, reasoned that a composite sketch made shortly after a crime had greater probative value than a courtroom identification many months later. (People v Griffin, 29 NY2d 91, 94.) The dissent quoted from People v Gould (54 Cal 2d 621, 626, 7 Cal Rptr 273, 275) in which the California Supreme Court permitted an extrajudicial prior photographic identification, on the grounds that the earlier identification had "greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness’ mind.” Nevertheless, the law in New York is settled that trial testimony concerning a previous identification from a composite sketch is impermissible.