*674 OPINION OF THE COURT
Hancock, Jr., J.
Defendant’s appeal presents a novel question: whether evidence of a prior extrajudicial identification made by the complaining witness from a videotape taken by the police, canvassing a particular neighborhood and focusing on numerous passersby, is inadmissible as a matter of law under CPL 60.30. We hold that such evidence may be admitted as proof of identity provided there is nothing suggestive in the videotape or the manner in which it was presented to the witness. In this case, the hearing court’s findings "that the videotape procedure employed by the police officers and the subsequent viewing by the victim were neither suggestive nor prejudicial” *675 (137 Misc 2d 408, 410) are supported by the evidence, and, accordingly, there should be an affirmance.
I
After a trial on charges stemming from a savage attack on the victim on the night of April 6, 1987, a jury found defendant guilty of attempted murder in the second degree (Penal Law § 125.25 [1]) and assault in the first and second degrees (Penal Law § 120.10 [2]; § 120.05 [1]). The victim testified that she met the man who attacked her on the street (she had seen him three or four times previously, she said). She went with him to a building in the Lincoln Housing Projects where the man repeatedly assaulted her, choked her into unconsciousness and caused severe injuries which required her hospitalization for almost three weeks. In the hospital, the victim gave the police a description of defendant and told them where she thought he could be found. Acting on this information, the police made a videotape and showed it to her. She identified the man who attacked her from the videotape and the police arrested defendant on April 25, 1987. The next day, she identified defendant at a precinct lineup.
On defendant’s motion to suppress the evidence of the victim’s identification of him from the videotape, the court conducted a suppression hearing during which it viewed the entire tape. At the hearing, the People presented one witness, Detective Edward May. He testified that he interviewed the victim at the hospital and received information from her concerning the attacker’s description and the possibility of finding him in the vicinity of 55 West 129th Street and Fifth Avenue between 131st and 132nd Streets.
The facts pertinent to the videotaping procedure and its viewing by the victim may be briefly summarized. Officer May with two other detectives stationed a surveillance van at various locations in the area described by the victim and randomly videotaped the passersby on the street. The 50-55-minute tape depicts the pedestrian traffic at 10 to 15 different locations, and focuses particularly on individuals generally matching the description provided. Of the men appearing in the videotape, 50 are seen in closeup or "zoom” shots. About one-half hour into the tape, the defendant is depicted in one of the closeup shots, standing at the entrance of 55 West 129th Street. He appears in the midst of a group of men seen going into and out of the building.
*676 The victim’s viewing of the videotape took place at her home the day after her release from the hospital. Officer May, using a portable VCR and viewer, played the tape without sound. The victim recognized certain landmarks and various people shown on the screen. When defendant’s image appeared, she promptly and unequivocally identified him.
In its written decision concluding that the identification procedure was neither "suggestive nor prejudicial” and denying defendant’s suppression motion, the trial court made the following findings: "There was nothing in the manner in which the tape was made and thereafter viewed by the victim that unduly influenced her to identify the defendant. The officers admittedly concentrated the camera’s attention on those who matched the victim’s description of the assailant. The description could apply to many of those who came within camera range. Nothing in a viewing of the tape suggests that the defendant was singled out in any way. The tape was presented to the victim without prompting. She viewed the tape, and commented from time to time on people she recognized. Her identification of the defendant was immediate and certain when his image appeared on the tape.” (137 Misc 2d, at 410.) Defendant’s conviction was affirmed by the Appellate Division, without opinion.
II
Discussion of the admissibility of pretrial identification procedures under CPL 60.30 must start with a reiteration of our established rule that suggestive pretrial identifications are to be excluded (see, People v Adams, 53 NY2d 241, 251). The purpose of the rule is plain: to "reduce the risk that the wrong person will be convicted as a result of suggestive identification procedures employed by the police.” (Id., at 251.) As we recently noted in People v Riley (70 NY2d 523, 530), the "importance of identification evidence is, of course, self-evident. But then so, too, are the weaknesses and dangers of improper identification evidence. 'The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other factor — perhaps it is responsible for more such errors than all other factors combined’ (Wall, Eye-Witness Identification in Criminal Cases, at 26, quoted in United States v Wade, 388 US 218, 229).”
Being mindful of these admonitions, we conclude that there is nothing inherently suggestive in the videotaping procedure *677 employed here which should render evidence of the witness’s identification inadmissible. As found below, defendant was not singled-out, portrayed unfavorably, or in any other manner prejudiced by police conduct or comment or by the setting in which he was taped. In fact, it is undisputed that, at the time of the videotaping, the police neither suspected defendant nor had any reason to believe that the victim’s assailant would be among the pedestrians they might actually get on camera.
The police simply canvassed the area in which the victim had previously seen the assailant and videotaped all the pedestrian traffic at the locations she had mentioned. Though they took a closeup of defendant, they did the same for approximately 50 other individuals and did nothing, visually or through commentary, to distinguish defendant from the rest. Thus, when the police "zoomed in” on defendant, they did so only as part of a continuous flow of pedestrians, all of whom matched the victim’s general description of her assailant and were engaged in seemingly unremarkable activities.
Contrary to defendant’s contentions, the videotape and its presentation to the victim suffered none of the problems of identification procedures we have disapproved in prior decisions. The procedure here was certainly not akin to the type of precinct showup at issue in People v Ballott (20 NY2d 600). There, in what we condemned as a "grossly and unnecessarily suggestive” identification procedure (id., at 607), defendant, under arrest at the police station, was made to don a hat and a coat similar to those worn by the robber and to utter words which the robber had reportedly spoken to the victim. The videotaping procedure here is in no way analogous. The viewing of defendant was not contrived or posed. He was videotaped going about his business on the street without interference or direction by the police.
Nor is there any similarity here to the fatally flawed showups in People v Riley (70 NY2d 523), People v Rodriguez (id.), or People v Adams (53 NY2d 241, supra). In Riley, the two suspects identified by the armed robbery victim were the only nonuniformed persons in the station house room and were positioned near a table bearing the stolen property and a weapon; in Rodriguez, the two identified suspects were shown handcuffed and in civilian clothes, being escorted into the police barracks by two uniformed officers; and in Adams, the victims were first informed that the police had the three suspected robbers in custody and then shown the suspects *678 being held, by police officers, with their hands behind their backs. The videotape procedure here bears no resemblance to those showups. Defendant appeared on the videotape by happenstance among many pedestrians in natural, nonpolice surroundings; he was viewed without any suggestive comment or conduct by police.
For like reason, the videotaping used in this case does not suffer the potential prejudice we have recognized in photo arrays. A "rogues’ gallery” of "mug shots” shown to a witness or mentioned to a jury is likely to create an inference that the identified suspect has had previous trouble with the law (see, People v Caserta, 19 NY2d 18, 21). Moreover, such photographs are sometimes of poor or uneven quality and easily distorted (id.). By sharp contrast, a videotape, randomly canvassing pedestrians on the street, imputes no prior criminality to those it depicts, and it reflects their likeness and physical characteristics more uniformly and completely than does an array of still photographs (see, People v Tunstall, 97 AD2d 523, 524, mod 63 NY2d 1).
Finally, we have previously approved the admission into evidence of a videotaped lineup. In People v Tunstall (63 NY2d 1, 10, modfg 97 AD2d 523, supra), we adopted the reasoning of the Appellate Division which found videotaping to be a fair and effective tool in identification. What that court said in the context of the lineup there is equally relevant here: "Unlike photo array identifications videotapes can accurately depict the makeup of a lineup without imputing prior involvement with the law. Bolstering is also minimal. Since the identifying witness’ credibility is the only one under scrutiny, videotaped lineups avoid the possibility that the credibility of third parties will be used to strengthen a questionable identification” (97 AD2d, at 524 [citations omitted]). Indeed, the videotaping procedure used here is, in some respects, even less suggestive than the videotape of a lineup. A lineup, whether on videotape or in person, typically involves a small number of participants, at least one of whom is under suspicion. A videotaped canvass of pedestrians on the street does not focus attention on so few a number of individuals (cf., People v Landor, 92 AD2d 625, 626 [victim immediately pointed out defendant in room containing 200 people]), nor does it even suggest that a suspect is among them. Of course, videotaping could be abused in such a way as to single out a police suspect to a witness. But, when used with complete *679 randomness, as it was here, it can avoid the intimation of suspicion that is sometimes difficult to prevent in a lineup.
In short, just as there can be no objection to permitting a victim to canvass an area for her attacker, there can be none to a videotaping procedure, such as that used here, which simply permits her to do the same without actually being on the streets. Defendant’s remaining contentions are either without merit or unpreserved.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Bellacosa concur.
Order affirmed.