OPINION OF THE COURT
Michael R. Juviler, J.
This is a written version of a decision that was delivered from the bench after a hearing on a motion to suppress an undercover narcotics officer’s identifications. The defendant is charged with two counts of criminal sale of a controlled substance in the first degree.
THE ISSUE
During an investigation, the undercover officer viewed surveillance videotapes and a photograph of the suspect, alleged to be the defendant. The defendant contends that each of these "identification” procedures involved undue suggestiveness. The People respond that each "identification” procedure was "confirmatory.” (See, People v Rodriguez, 79 NY2d 445; *740 People v Harewood, 206 AD2d 437.) The People also contend that each viewing was a valid "investigatory” procedure. The case therefore requires an analysis of "confirmatory” and "investigatory” viewings.
FINDINGS
The People have the burden of going forward with evidence to show the absence of unnecessary suggestion in the procedures. Then it becomes the defendant’s burden to prove that there was unnecessary suggestion. (People v Stephens, 143 AD2d 692.) Having reviewed the evidence, I make the following findings of fact and conclusions of law.

1. October 12: The first two meetings with J.D. Junior.

In October 1994, a team of police officers was conducting an investigation of narcotics trafficking in Bushwick, Brooklyn. Central to the investigation was the work of an undercover police officer with one year of experience undercover.
On October 12 at 5:00 in the afternoon the undercover officer met a suspect known then only as Jose. This meeting was secretly recorded by the police on videotape and audiotape. Jose did not have drugs with him, but said that he would meet the undercover officer presently.
At 6:30 that evening, at Myrtle and St. Nicholas Avenues, the undercover officer again met Jose. This time Jose brought with him another man, alleged to be the defendant, Gaspar Cuevas, whom the undercover officer had never seen before. As his identity was unknown, he was referred to in subsequent police reports as "J.D. Junior”, meaning John Doe Junior. After questioning the undercover officer about his roots in Brooklyn, Jose and Junior agreed to meet him at another location later the same day. This initial encounter between the undercover officer and Junior was recorded on videotape, which was in evidence at the hearing, and on audiotape. The conversation lasted 10 minutes, during most of which the parties were face-to-face. It took place on the street in sufficient lighting to enable the videotaping and the observation by the undercover officer of Junior’s face and features.
Half an hour after this initial meeting, the undercover officer met Junior, by arrangement, at DeKalb and Evergreen Avenues. This time Junior had drugs with him — 62 grams of cocaine, which he sold to the undercover officer for $1,200. The transaction, which lasted 15 minutes, was conducted inside and outside a car, face-to-face. It was not taped.

*741
2. October 14: The first videotape screening.

Two days later, on October 14, the undercover officer had a meeting with other members of the police narcotics team, including Detective John Lavin, the People’s witness at the hearing. The purpose was for all the investigators to view the videotape that had been made of the street meeting of Jose, Junior, and the undercover officer, to enable the undercover officer to show the other police investigators what the two suspects looked like — and, necessarily, which suspect was which — so that during the ongoing investigation the other officers could conduct surveillance of Jose and Junior, whose identities were still unknown to the police.
I find that this viewing of the video by the undercover officer was not an unduly suggestive police identification procedure. It was not an "identification” procedure at all, in the common meaning of that term. It was an investigative procedure, designed to allow the undercover officer to share his information — specifically, his knowledge of the appearance, and in that sense the identities, of Jose and Junior — with other officers who were taking part in the same investigation, and to verify the utility of the videotape as evidence of a crime.
Contrary to the People’s characterization, this procedure was not "confirmatory” of anything, except confirming that this was a videotape of the three-way encounter. A confirmatory identification is one in which the witness, usually by looking at one person or the photographic image of one person, confirms that the person who was arrested was the person, known to the witness, whom the witness had had in mind and had referred to in an earlier interview with the police. In the alternative, a confirmatory identification is one in which the witness, usually by looking at one person or the photographic image of one person, confirms that the person whom the police are targeting or plan to arrest, a specific person whose identity is known to them, is the person, known to the witness, whom the witness has in mind. In either case the one-on-one aspect of the viewing is permissible because the witness knows the suspect well enough for suggestion to be removed as a factor in the case. (People v Rodriguez, supra; People v Harewood, supra.) Neither of these two purposes was the purpose for screening the videotape on October 14.
This was not "confirmatory”, but that is no reason to "suppress” it, because enabling the other investigators to benefit from the undercover officer’s knowledge by screening the videotape was not an "unnecessarily suggestive” procedure: (1) *742 there was no reasonable alternative, so it was not "unnecessary”, and (2) "suggestion” had nothing to do with it. The undercover officer was not subject to suggestion, and the purpose and effect of showing the tape was not to suggest to him that either man who appeared with the undercover officer on the tape was guilty of anything. The communication was in reverse: it flowed from the undercover officer to his police colleagues, not from them to him; the screening of the videotape was functionally equivalent to his having made the tape, brought it to his colleagues, and shown it to them.
Furthermore, the videotape of Jose, Junior, and the undercover officer included many other persons on the street, some male, and some female. While not identical to the videotape at issue in People v Edmondson (75 NY2d 672), which showed only passersby without concentrating on particular persons, and therefore was not suggestive, it was similar in important respects to the tape in Edmondson. It was a videotape of everyone at a specific street location. It showed many persons walking and standing on a busy street, not just the person referred to as Junior. Under all of the circumstances, this was no more "suggestive” than a lineup containing a suspect and a few fillers. (See, People v Hernandez, 164 AD2d 920 [there is no prescribed number of persons for a lineup]; People v Chipp, 75 NY2d 327, cert denied 498 US 833; People v Baptiste, 201 AD2d 659 [there is no requirement that the defendant in a lineup be surrounded by persons whose physical characteristics are nearly identical to his].)
In additibn, under the circumstances of this case, the undercover officer, unlike the civilian witness who viewed the videotape in Edmondson (supra), was not subject to suggestion. He was a trained investigator whose functions included observing and describing narcotics sellers, he had a year of experience doing that, and only two days before the screening he had spent a total of 25 minutes in prearranged face-to-face meetings with the suspect under intense, memorable circumstances, the negotiation of a substantial drug purchase.
In the light of all of these facts, this viewing of the tape differs from an inherently suggestive one-on-one station house showup conducted a week or more after a routine drug purchase. (See, e.g., People v Gordon, 76 NY2d 595; People v Baron, 159 AD2d 710; People v Smith, 203 AD2d 495.)

3. October 20: The third meeting with J.D. Junior.

The next relevant event occurred six days after the first video screening and eight days after the first drug sale: On *743 October 20, the undercover officer met J.D. Junior at Wilson and Myrtle Avenues. The meeting had been arranged so that the undercover officer could buy 125 grams of cocaine, twice the amount of the first purchase. The sale took place in the undercover officer’s car, in daylight, at 5:15 in the afternoon. The transaction took 15 minutes. Junior sat in the front passenger seat, the undercover officer next to him in the driver’s seat. Their conversation was broadcast secretly to other police officers by radio. The car was videotaped from a distance.
After Junior had left the undercover officer’s car, a videotape was made of a sidewalk in front of a restaurant at Myrtle and Central Avenues, which the police believed Junior and Jose frequented. The purpose of the videotaping was to see and record whether Junior or Jose would appear there to deliver the money that the undercover officer had given Junior for the 125 grams of cocaine. The videotape, in evidence at the hearing, shows persons passing by and others entering or leaving the restaurant. Some are male, some female. The person who appears most prominently in this videotape is the person asserted to be J.D. Junior, standing in front of the restaurant.
The videotape of the undercover officer’s car on October 20 has no utility as evidence of identification, or to show J.D. Junior’s appearance, because Junior is almost completely obscured by the car, passing traffic, and a fence. The images of the alleged J.D. Junior in front of the restaurant on October 20 are unobstructed and clear — much clearer than the images of the suspect on the tape of October 12.

4. October 21: The second videotape screening.

On the next day, October 21, both portions of the last videotape — showing the undercover officer’s car and the restaurant — were displayed to the undercover officer and members of his field team, including Detective Lavin. The purpose was to determine whether J.D. Junior was depicted in either scene, and to show his appearance to the other investigators.
Upon viewing the first scene the undercover officer said that it depicted the car at the time of the drug sale by Junior. Contrary to both parties’ characterization of the viewing of this first portion of the video, it was not an "identification” procedure. The tape showed nothing except the undercover officer’s car and, vaguely, the very top of a person’s head.
The viewing of the second portion of the tape did show the person alleged to be Junior with enough clarity for the *744 undercover officer to tell Detective Lavin and other members of the team that that was the person from whom he had bought drugs earlier on October 20. This was sufficient for the investigators to know who the suspect was and what he looked like, so that they could continue surveillance of him. Here, as was the case with the viewing of videotape on October 14, this was a reasonable investigatory procedure to enable the undercover officer to share information with others in the investigating team.
For reasons already stated regarding the viewing on October 14, the viewing on October 21 was not one in which the undercover officer was subject to suggestion. At one point the videotape was isolated on the person alleged to be Junior, but that was only because that person was alone at the time. And the undercover officer was free to say whether or not that was Junior. Moreover, by this time the undercover officer had observed Junior at close range under intense circumstances on three separate occasions on two different dates, for a total of 40 minutes. So here, as was the case with the viewing on October 14, suggestion was not an issue.
At this point, October 21, the investigators still did not know J.D. Junior’s identity. For that reason a clever ruse was designed, and it was improvised on the spot on October 24, three days after the second screening.

5. October 24 and 25: The obtaining and viewing of the first photograph.

On October 24, Detective Lavin and a partner went in uniform in a marked police van to the section of Bush wick where J.D. Junior was believed to hang out. They waited there for him to appear.
If the undercover officer had not shared with Detective Lavin and other investigators his knowledge of Junior when they all had viewed the videotapes on October 14 and October 21, Detective Lavin would not have known which person in the neighborhood was J.D. Junior. Many persons fit the description. This shows the importance to the investigation of the undercover officer’s viewing of the videotapes in the company of his colleagues.
It happened that on October 24, at Myrtle and Central Avenues, the person believed to be J.D. Junior was riding a bicycle when Detective Lavin saw him. The defendant concedes that this was the man who had been shown clearly on the tape taken in front of the restaurant on October 20, and that this was the defendant, Gaspar Cuevas.
*745 Lavin and. his partner approached the defendant, stopped him, and pretended to be investigating a recent robbery of a bicycle. They asked for identification and for a bill of sale for the bicycle. The defendant produced two identification cards. The name Gaspar Cuevas and the defendant’s picture appeared on one of them. (On the other card the last name is spelled C-u-e-u-a-s.)
Lavin and his partner took these items into the van, while the defendant waited outside.[1] Inside the van, the officers photographed the identity cards, using Polaroid film. When this was completed they returned the two identity cards to the defendant.
On the following afternoon, October 25, Detective Lavin showed the undercover officer the photographs of the defendant’s identity cards. The undercover officer identified the man in the picture as J.D. Junior, the drug seller.
This proceeding can accurately be called a "confirmatory identification.” (See, People v Lane, 185 AD2d 282.) Its purpose was to confirm whether the specific person facing continued surveillance, and imminent arrest who had given his identity cards to Detective Lavin was the same person whom the undercover officer had in mind as J.D. Junior, the seller of drugs. Suggestion was not an issue here, for reasons already stated, and additional reasons. Surely, the undercover officer was not subject to suggestion by this time. He had been with Junior in three negotiating sessions. He already had seen Junior on a videotape four days earlier, and on a different tape a week before that. The only feature absent from the screening of the videotapes was J.D. Junior’s true identity.

6. October 25 and November 1: The obtaining and viewing of the second photograph.

After this truly confirmatory identification on October 25, Detective Lavin, having the benefit of knowing that Gaspar Cuevas was the J.D. Junior whom the undercover officer had in mind, checked the police computer files to see whether Gas- *746 par Cuevas, the defendant, had an arrest record. The computer revealed that on October 24, some hours after the defendant had shown his identity cards to Detective Lavin, he had been arrested in an unrelated drug case. The check also revealed what the court file of this case reveals — that the defendant had a record of previous arrests, and that the arrest preceding the arrest of October 24 had resulted in an adjournment in contemplation of dismissal (ACD).
At this point on October 25, Detective Lavin had the identity of the suspect, and could obtain arrest photographs of him. He obtained arrest photographs of Caspar Cuevas and showed two of them to the undercover officer about a week later, on or about November 1. The undercover officer confirmed that these arrest photographs showed J.D. Junior. This was the second "confirmatory identification” in the proper sense of that term. I need not spell out again the reasons for this conclusion, and add merely that by this time the undercover officer had recognized Junior’s image three times — twice from videos and once from the photograph of Caspar Cuevas’s identity card. By this time "the issue of identification was behind” the police, and suggestiveness was no longer a potential factor. (See, People v Lane, 185 AD2d 282, 284, supra.) It was entirely proper and not unduly suggestive for the police to confirm by use of an arrest photograph that the person arrested under the name Caspar Cuevas was the Caspar Cuevas whose picture the undercover officer had identified on October 25 as the person from whom he had bought drugs. (People v Harewood, 206 AD2d 437, 438, supra.)
The defendant contends that this identification must be suppressed because the arrest photographs were not introduced in evidence at the hearing. Their absence has no significance. It results from the return of the photographs by court order; they were the arrest photographs in the case that ended in an ACD, and had to be returned. (CPL 160.50, 215.40.)
The defendant’s arrest in the unrelated drug case on October 24, 1994, initiated his custody, which has lasted continuously until this day. The investigation ended on November 28 upon the arrest of Jose, the defendant’s codefendant in this case, Jose Rodriguez.
ADDITIONAL DISCUSSION
There is a distinction between proper investigatory procedures using videotapes or photographs and identification procedures using them. It is proper under appropriate circum *747 stances for undercover officers to look at tapes or photographs as an investigative technique, to enable them to share information with other members of the investigating team, or to verify that the crime has been captured on tape or film. (See, People v Kearn, 118 AD2d 871, 873; People v Freeman, 176 AD2d 1090.) This should be allowed, under suitable conditions, because that is important to facilitate surveillance and other investigative procedures, and because undercover officers, unlike civilian witnesses, are trained observers and have planned for their encounters with the suspects. (See, People v Morales, 37 NY2d 262, 271; People v Wharton, 74 NY2d 921, 923.)
At the same time, the court must recognize that not every one-on-one viewing by an undercover officer is free from undue suggestion, even if the People call it "investigatory” or "confirmatory”. (See, People v Perez, 74 NY2d 637; People v Gordon, 76 NY2d 595, supra; People v Mato, 83 NY2d 406.) But the facts in the cited cases are distinct from those here. For example, Perez involved a viewing of a mug shot several weeks after a single purchase of drugs.
The facts here are closer to those in People v Harewood (206 AD2d 437, supra) in which the Wade hearing established that the undercover officer had met the defendant, and later had made two separate purchases from him, thereby completing three face-to-face meetings within a month. Thereafter, the officer looked at mug shots of the defendant eight days after the first purchase and four days after the second. The hearing court’s finding that these were confirmatory viewings free from undue suggestion was upheld by the Appellate Division. In the present case, there were three meetings in eight days, and the first confirmatory identification was made five days after the last meeting.
Whether investigative techniques have unduly suggestive features depends on the facts of the particular case. The court in this case is satisfied, on the basis of all of the facts, that the issue of suggestion is removed from the case, the use of the videotapes was a proper investigatory technique free from undue suggestion, and each use of the photograph was a "confirmatory identification” in the true sense of that legal term of art.
*748 For these reasons, the motion to suppress identification evidence is denied.[2]

. The defense has made no claim of an unlawful seizure of these identity cards. No such claim could validly be made: The officers had probable cause to arrest the defendant for two separate class A-l felony sales of narcotics. They would have been authorized to seize him, handcuff him, and search him. (People v De Santis, 46 NY2d 82, 87, cert denied 443 US 912.) Instead, they undertook a far less intrusive method of learning his identity, one which involved almost no intrusion of his privacy but preserved the secrecy of the investigation.

. The admissibility of evidence of the videotape procedures and the photographic procedures will be questions of evidence for the trial court to resolve.