[730 NYS2d 810]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CARL GEE, Appellant.

Fourth Department, September 28, 2001

**APPEARANCES OF COUNSEL**

*Kathleen P. McDonough, Public Defender's Office,* Rochester, for appellant.

*Howard R. Relin, District Attorney* of Monroe County, Rochester (*Amy I. Molloy* of counsel), for respondent.

**OPINION OF THE COURT**

KEHOE, J.

On this appeal by defendant from a judgment convicting him of robbery in the first degree (Penal Law § 160.15 [4]) arising out of his forcible theft of cash from a convenience store clerk, we must determine whether defendant is entitled to suppression or preclusion of identification evidence in connection with the clerk's viewings of the store surveillance video and photographs depicting defendant's commission of the robbery. We conclude that he is not.

**I**

At 11:20 P.M. on November 14, 1997, defendant and a female accomplice held up the clerk of a convenience store. The evi-

dence against defendant included the testimony of the clerk, who identified defendant at a pretrial lineup and at trial as the male robber. The jury viewed the store surveillance video, which depicts the robbery, and a one-sheet composite of five still photographs extracted from that video, which "stills" clearly depict defendant as the male robber. Further, the jury viewed a second composite of three of those stills, blown up and positioned alongside defendant's mug shot, showing the resemblance between the robber and defendant. The record makes clear that the clerk recounted the crime and identified defendant in court based on her observations during the robbery itself, which lasted about three minutes, and also based upon her involvement in a series of pretrial "viewings," as follows:

(1) *The clerk's initial viewing of the store security videotape* in the presence of a police officer and the store manager on November 15, 1997. The security videotape is not a moving picture, but consists of a continuous succession of very quick cuts (10 per second) among four surveillance cameras positioned throughout the store. The viewing took place at the police station within a short time after the robbery. It lasted about 20 minutes, during which portions of the videotape were "freeze-framed" and/or replayed very slowly (which they must be in order for the viewer to discern any detail). During the viewing, the clerk said, "That's them," when the robbers were shown in the store. She also pointed out certain actions of the robbers, such as when the male robber displayed what appeared to be a firearm.

(2) *The clerk's initial viewing of a one-sheet composite of five stills taken from the videotape* and depicting the individuals previously designated by the clerk. That viewing took place on November 19, 1997, five days after the robbery. During that viewing, a second police officer informed the clerk that the pictures were from the videotape. At the officer's request, the clerk confirmed that the stills were accurate depictions of the robbery and its perpetrators, and she specifically identified a male individual as one of the robbers.

(3) *The clerk's viewing of a lineup* on December 29, 1997, during which the clerk identified defendant as the male robber.

(4) *The clerk's subsequent re-viewings of both the store surveillance video and stills.* Those viewings took place a few days before trial, in preparation for the clerk's testimony.

## II

Viewings 2 and 3 are the subjects of the CPL 710.30 notice served by the People on March 12, 1998;[1] of defendant's motion to suppress the identification evidence; of the *Wade* hearing conducted by County Court on May 15, 1998, at which the officer involved in viewings 2 and 3 was the sole witness; of the Trial Judge's May 19, 1998 decision, which denied defendant's *Wade* motion on the ground that the stills composite and lineup were not so suggestive as to give rise to a risk of misidentification; and of defendant's second point on appeal, which seeks suppression of the lineup and in-court identifications. In contrast, viewing 1 and possibly viewing 4 are the subject of defendant's first point on appeal, which seeks preclusion of all evidence relating to the clerk's identification of defendant. Viewings 1 and 4 are not mentioned in the CPL 710.30 notice, were not a subject of defendant's suppression motion, the *Wade* hearing, or the Trial Judge's *Wade* decision (all of which long preceded viewing 4). The clerk's initial viewing of the store surveillance videotape (viewing 1) was first revealed during the trial testimony of the officer involved in viewing 1. Defendant promptly moved for preclusion of the identification testimony based on the People's failure to advise of that "identification procedure" in the CPL 710.30 notice. The Trial Judge denied that motion. Thereafter, viewing 4, the clerk's reviewing of the video and stills in preparation for trial, was disclosed during the clerk's testimony. That revelation did not result in any further demand for preclusion.

Notwithstanding his alibi defense, the jury found defendant guilty of robbery in the first degree.

## III

Defendant contends that the court erred in denying his motion to preclude identification evidence based on the People's failure to give adequate notice of viewing 1 pursuant to CPL 710.30. He further contends that the court erred in denying his motion to suppress such identification evidence based on viewing 2, which he alleges was unnecessarily suggestive. Finally,

---

1. Although the CPL 710.30 notice lists the clerk's viewing of the surveillance stills as a "photo ID" and an "identification procedure," the People have argued throughout this case that such notice was given by them merely as a precaution. They have argued that such viewing was "not an identification procedure per se, because [each still is] actually a photograph of the event as it was occurring" and "was shown to [the victim] merely to confirm that it is a fair and accurate picture of the people involved in the robbery."

defendant contends that he was denied a fair trial as a result of ineffective assistance of counsel and prosecutorial misconduct. We reject defendant's claims of ineffective assistance and prosecutorial misconduct, the various components of which are unpreserved for our review, based on matters outside this record, the subject of a prior unsuccessful CPL article 440 motion, and/or without merit.

## IV

■ Addressing defendant's second point first, we conclude that suppression of the clerk's lineup (viewing 3) and in-court identifications was properly denied. Defendant contends that showing the clerk the composite of stills from the surveillance video (viewing 2) was unduly suggestive and tainted the subsequent lineup (viewing 3) and in-court identification. He analogizes this case to those holding it unnecessarily suggestive for police to display defendant by himself or to show a single photograph of defendant (*see, e.g., People v Johnson,* 81 NY2d 828, 831; *People v Pries,* 206 AD2d 873, 873-874), and seeks reversal of his conviction and remittal for a hearing to establish whether the clerk had an independent basis for her in-court identification of defendant (*see generally, People v Burts,* 78 NY2d 20, 23-25; *People v Holmes,* 202 AD2d 1011, 1013, *lv denied* 83 NY2d 911).

The cases cited by defendant have no application here. At the outset, we note that to treat the viewing of surveillance or security photos or videos as a police-arranged identification procedure, and to forbid a witness from viewing such depictions of the crime itself in furtherance of the police investigation, would be to reward defendant for his own hubris in committing the crime on camera.[2] More fundamentally, we conclude that the viewing in question did not constitute an identification procedure, and certainly not an unnecessarily suggestive one. Police did not show the clerk any photographs of an individual *known* to be defendant, or indeed of any *known* individual *believed* to have committed the robbery. Authorities did not seek the clerk's confirmation that a known *suspect* was the culprit. Instead, police showed the clerk five depictions of *the robbery* itself, in the form of a composite of stills taken from the store security video showing the crime as it occurred. At the time of that viewing, defendant was not an identified

---

**2.** Defendant's awareness of the store's video surveillance system is well established on this record. Before fleeing the store, defendant unsuccessfully attempted to destroy the taping system or remove the tape.

suspect, but a perpetrator of unknown identity. Police showed the clerk the stills in order to ascertain for themselves which of the individuals entering the store that day had committed the robbery (*cf., People v Edmonson*, 75 NY2d 672, 676-677, *rearg denied* 76 NY2d 846, *cert denied* 498 US 1001). (Who the robbers were is not immediately obvious on the face of the video, given its quick-cutting style.) In response to police queries, the clerk merely confirmed where the crime and its perpetrators had been captured on videotape, and that the stills fairly and accurately depicted the crime and its perpetrators. She did so, however, without identifying any particular suspects or known individuals as the perpetrators. Thus, the viewing was not an identification procedure, but rather an investigatory measure designed simply to allow the clerk to report the crime to police (*cf., People v Cuevas*, 167 Misc 2d 738, 741-742) and to authenticate the stills.

Insofar as a crime victim or other eyewitness is concerned, showing a depiction of the unknown criminal engaged in the actual commission of the crime is far different from—and far less potentially suggestive than—showing a depiction of a known individual suspected of being the criminal. Indeed, police in this case did not know the identity of the persons depicted in the photos (*cf., People v Edmonson, supra,* at 677). Consequently, they did not and could not, either by word or deed, draw the clerk's attention to any particular suspect or known person (*cf., People v Edmonson, supra,* at 677-678). Police were in no position to manipulate the surveillance images or otherwise suggest anything to the victim. The victim herself was "impervious to police suggestion" under these circumstances (*People v Rodriguez*, 79 NY2d 445, 452; *cf., People v Breland*, 83 NY2d 286, 295). Indeed, it is difficult to conceive how looking at the surveillance stills could "suggest" anything to one who had recently experienced what is depicted in the stills.

In any event, the test for suppression of identification testimony is whether it has been tainted by a procedure "so unnecessarily suggestive as to create a substantial likelihood of misidentification" (*People v Moore*, 264 AD2d 693, 694, *lv denied* 94 NY2d 826; *see, People v Adams*, 53 NY2d 241, 251; *People v Rahming*, 26 NY2d 411, 416). Here, even assuming, arguendo, that the procedure utilized by police was an identification procedure, we conclude that it was not "unnecessarily suggestive." We discern no reasonable investigative alternative to the officers' reviewing the depictions of the rob-

bery with the clerk in order to authenticate the photos and obtain confirmation concerning which individuals depicted were the robbers. Certainly defendant does not suggest a reasonable alternative. To analogize surveillance tapes and photographs of a crime in progress to mug shots, and to require police to show such depictions to the witness (if at all) in an "array" as opposed to singly, would be to require the police to stage recreations of the crime, film or photograph those recreations, and use them as "fillers." Practicality precludes any such measures, and fairness does not require them.

We discern no constitutional infirmity in showing a crime victim or other eyewitness photographs of the crime itself. We are aware of nothing in the Due Process Clause that requires police to forego such an obviously fair, efficient and useful initial investigative step. To the extent that an eyewitness's ability to make a subsequent out-of-court or "in-court identification * * * [may be] enhanced by the [viewing of surveillance] photographs, we consider that [to be] not only permissible, but wholly desirable" (*George v State*, 521 So 2d 1287, 1289 [Miss]). The Due Process Clause prohibits only those unfair procedures that give an eyewitness a false sense of confidence in a mistaken identification. No concerns of fairness are raised by a procedure that enhances the eyewitness's memory of the crime and hence the accuracy and reliability of the eyewitness's identification. In any event, it is incontrovertible that the viewing in this case created absolutely no risk of *mis*identification by the clerk, because the surveillance photographs depict the perpetrators in the act.

We have found no New York cases precisely on point, with the possible exception of *People v Mallory* (126 AD2d 750). It holds "that the showing of a photograph of the defendant by a detective, separately, to two witnesses five days after a bank robbery, with the representation that the photograph was obtained from the main office of the bank and was taken on the day of the robbery, was an unduly suggestive identification procedure." Assuming that the photograph viewed was one of the criminals engaged in the actus reus, we nonetheless deem *Mallory* to be of questionable authority on this issue, as its holding is expressly based on a concession by the People (*see, People v Mallory, supra,* at 750). In any event, we disagree with that holding, which runs counter to the great weight of authority from other jurisdictions.

For example, in *People v Kurylczyk* (443 Mich 289, 309-310, 505 NW2d 528, 537, *cert denied* 510 US 1058), the Supreme

Court of Michigan rejected a claim that a photo array identification by bank tellers was improperly influenced by their prior viewing of surveillance photographs published in the local newspaper. The court noted, "Generally, the use of such surveillance photographs to identify a subject is not impermissibly suggestive, 'since such films provide a memory-refreshing device, showing "the man who actually committed the robbery" as opposed to the picture of "some possible suspect in the police files" ' " (*People v Kurylczyk, supra,* 443 Mich, at 309-310, 505 NW2d, at 537, quoting Sobel, Eyewitness Identification § 5.3 [g], at 5-44). In *Jackson v State* (808 SW2d 570, 572 [Tex]), the Court of Appeals of Texas held that there was no likelihood of misidentification where, as here, the surveillance still was a depiction of the *actual perpetrators* in commission of the crime" itself, and where, as here, police had furnished the still to the victim for purposes of authentication (emphasis in original). In an unpublished opinion in *United States v Plumes* (908 F2d 978, 1990 WL 102775, *3, *cert denied* 502 US 912), the Ninth Circuit wrote:

> "Plumes argues that the government's practice of showing witnesses single bank surveillance photographs of the bank robber, rather than using multiple photograph displays or lineups, was impermissibly suggestive and compromised the fairness of the trial. * * *

> "The government procedure in this case of showing witnesses bank surveillance photographs of the actual robberies was not impermissibly suggestive. *See United States v. Stubblefield,* 621 F.2d 980, 983 (9th Cir.1980). Plumes' rights were not jeopardized when the recollection of eyewitnesses was refreshed by the use of photographs of the crime itself. *Id.* 'Little possibility of misidentification arises from the use of photographs depicting "the likeness not of some possible suspect in the police files, but of the [persons] who actually committed the robbery." ' *Id.* (quoting *United States v. Evans,* 484 F.2d 1178, 1186 (2d Cir.1973)."

Also instructive is the Fifth Circuit's decision in *United States v Ervin* (436 F2d 1331, 1333-1334), which concerns a crime photograph shown to an eyewitness shortly before trial:

> "The photograph here involved was certainly not a typical 'mug shot.' It was instead a film-preserved

part of the res gestae showing the Havana, Cuba airport during the actual process of the accomplishment of this criminal action while it was still in progress. The fact that this photograph included a depiction of the perpetrator of the crime, who was shown both at a distance and at an oblique angle, did not make the photograph impermissibly suggestive within the meaning of [*Simmons v United States*, 390 US 377]. In fact it was not suggestive at all. The evidence disclosed that the photograph depicted a true detail of an active part of the hijacking and kidnapping. Its pre-trial display to prospective witnesses was no more than the equivalent of showing such witnesses a contemporaneously made written statement describing facts, in order to refresh their recollection and make their testimony more accurate. The photograph did not suggest possibilities, it showed facts. A review of events with witnesses prior to a trial is a time-honored and a legitimate, if not a required, part of the duty every attorney owes both the court and his client in the development of a trial's search for truth."

Similarly, in *United States v Irby* (517 F2d 506, 506-507, *cert denied sub nom. Smith v United States,* 424 US 973), the Fourth Circuit wrote:

"The showing of photographs taken during the course of the bank robbery to witnesses prior to their selecting photographs of defendants Irby and Smith from a photographic lineup was not unduly suggestive since it is not disputed that the first set of photographs accurately depicted the robbery as it occurred. Use of the first set of photographs in this manner served the useful purpose of refreshing the recollection of the witnesses to the end that their subsequent identification from the photographic lineup and an in-court identification of one defendant by one witness were rendered more accurate. Nor were the photographs used in the photographic lineup unduly suggestive."

To the same effect as the foregoing cases are numerous others, including *United States v Browne* (829 F2d 760, 764-765, *cert denied* 485 US 991); *United States v Monks* (774 F2d 945, 957); *United States v Love* (692 F2d 1147, 1151); *United States*

*v Casper* (679 F2d 136, 137); *United States v Montellano* (633 F2d 1313, 1324, *cert denied* 450 US 1043); *United States v Stubblefield* (*supra,* at 983); *United States v McNair* (439 F Supp 103, 105-106, *affd* 571 F2d 573, *cert denied* 435 US 976); *United States v Bridgefourth* (538 F2d 1251, 1253); *United States v Grose* (525 F2d 1115, 1117-1118, *cert denied* 424 US 973); *United States v Evans* (*supra,* at 1186); *People v Davis* (851 P2d 239, 241 [Colo]); *People v Loyd* (751 P2d 1015, 1017 [Colo]); and *State v Williams* (27 Wash App 430, 443-446, 618 P2d 110, 118-119, *affd* 96 Wash 2d 215, 634 P2d 868).

In sum, we conclude that showing the clerk a video of a crime that the clerk had herself recently experienced, without any overt or tacit attempts by police to link the photographs to a particular suspect or known individual, does not constitute an unnecessarily suggestive identification procedure.

## V

Defendant further contends that the court erred in failing to preclude the in-court identification and proof of the pretrial identification based on the People's failure to give notice pursuant to CPL 710.30 regarding the clerk's viewing of the videotape on the night of the robbery (viewing 1).[3] He contends that the People were obligated to give such notice, because the video viewing was a "police-arranged identification procedure" of which the People were required to give notice pursuant to CPL 710.30 (*People v Rodriguez, supra,* 79 NY2d, at 450; *see generally, People v Clark,* 88 NY2d 552, 556; *People v Dixon,* 85 NY2d 218, 222-223). We disagree.

CPL 710.30 provides in pertinent part:

> "1. Whenever the people intend to offer at a trial * * * testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him as such, they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered. * * *

---

**3.** The People also failed to advise of the clerk's re-viewings of the video and stills during the week before trial (viewing 4). In his brief, defendant adverts to viewing 4 without specifically tying it to his preclusion claim. It is well settled that such viewings for the purpose of trial preparation give rise to no obligations under CPL 710.30 (*see, e.g., People v Herner,* 85 NY2d 877, 879; *People v Hopkins,* 284 AD2d 223; *People v Jerold,* 278 AD2d 804, *lv denied* 96 NY2d 801).

"3. In the absence of service of notice upon a defendant as prescribed in this section, no evidence of a kind specified in subdivision one may be received against him upon trial unless he has, despite the lack of such notice, moved to suppress such evidence and such motion has been denied and the evidence thereby rendered admissible."

CPL 710.30 deals with the reality that not all police-arranged identifications are fair, reliable, and otherwise "free from unconstitutional taint" (*People v Newball,* 76 NY2d 587, 590; *see, People v Collins,* 60 NY2d 214, 218-219). By requiring notice, the statute grants a defendant an opportunity prior to trial to test the propriety of any pretrial identification procedures (*see generally,* CPL 710.20 [6]) and hence the reliability of any identification evidence that the People intend to offer against him. "Historically, CPL 710.30 'was * * * a legislative response to the problem of suggestive and misleading pretrial identification procedures treated by the Supreme Court in *Gilbert v California* (388 US 263), *United States v Wade* (388 US 218) and *Stovall v Denno* (388 US 293)'" (*People v White,* 73 NY2d 468, 474, *cert denied* 493 US 859; *see generally, People v Collins, supra,* at 218-219). Thus, "[t]he focus of [the statute is] on in-court identifications predicated on earlier police-arranged confrontations between a defendant and an eyewitness, typically involving the use of lineups, showups or photographs, for the purpose of establishing the identity of the criminal actor" (*People v Gissendanner,* 48 NY2d 543, 552; *see generally,* CPL 710.20 [6]). Conversely, where the particular identification procedure is such that defendant lacks any constitutional basis for challenging its propriety, fairness or suggestiveness—where, in other words, there is no colorable claim that the procedure or surrounding circumstances tends to undermine the reliability of identification evidence—the People need not give notice pursuant to CPL 710.30 (*see generally,* CPL 710.20 [6]; *People v Collins, supra,* at 218-219; *People v Gissendanner, supra,* at 552).

For the reasons outlined *supra,* we conclude that the clerk's viewing of the store surveillance video in this case was not an identification procedure subject to the requirements of CPL 710.30. Police had no suspects and did not ask the clerk to identify any particular suspect or known individual as the robber (*see, People v Harrell,* 151 Misc 2d 803, 807-808; *see also, People v Edmonson, supra,* 75 NY2d, at 677). Instead, police merely asked the clerk who among the persons in the store

that night had committed the robbery. They further sought to confirm that the surveillance video was an accurate depiction of the robbery and robbers. During that confirmatory process, the clerk said, "That's them," but did not thereby identify any particular suspects or known individuals as the robbers. Phrased in terms of the statutory test, the clerk identified the perpetrators, but did not identify defendant "as such" (CPL 710.30 [1] [b]; *see, People v Trammel,* 84 NY2d 584, 587-588; *People v Newball,* 76 NY2d 587, 590; *People v White, supra,* at 473). The clerk pointed out the criminal actor on the tape, but did not thereby "establish[ ] the identity of the criminal actor" (*People v Gissendanner, supra,* at 552). At bottom, neither the clerk's viewing of the surveillance video nor anything said to or by the clerk during that viewing was at all probative of defendant's guilt or innocence (*see, People v Peterson,* 194 AD2d 124, 127-129, *lv denied* 83 NY2d 856).

Further, to point out an unknown criminal actor on videotape is akin to giving a description of the appearance of that individual at the time of the crime. It is well settled that such observations or descriptions are "not within the ambit of CPL 710.30" (*People v Myrick,* 66 NY2d 903, 904; *see, People v Jones,* 163 AD2d 911, 912, *lv denied* 76 NY2d 941).

> "The fundamental purpose of CPL 710.30 (1) (b) is to permit a defendant an opportunity to raise the issue of whether the identification procedure was unduly suggestive and, if so, whether it is likely to affect the witness's ability to make an accurate in-court identification of the defendant as the person initially observed * * *. A failure to appreciate this fundamental purpose, and, particularly, the distinction between an observation and an identification procedure, may result in the erroneous invocation of CPL 710.30 (1) (b) any time a witness sees a defendant on more than one occasion prior to trial (*see, e.g., People v Wharton,* 74 NY2d 921; *People v Gissendanner, supra*; *People v Jenkins,* [176 AD2d 143, *lv denied* 78 NY2d 1128]; *People v Trottie,* 167 AD2d 438, *lv denied* 77 NY2d 844; *Matter of Leo T.,* [87 AD2d 297])" (*People v Peterson, supra,* at 128).

All that occurred in this case was that the clerk experienced the crime and then, no more than a few hours later, "had occasion" (*People v Gissendanner, supra,* at 552) to watch the crime unfold again from various other vantage points as it had been captured on videotape. Under the circumstances, the clerk's

viewing of the surveillance video had no potential for suggestiveness. Therefore, it is not the kind of police-orchestrated identification procedure of which a defendant is entitled to notice (*see, People v White, supra,* at 474; *People v Rufin,* 237 AD2d 866, 866-867; *People v Mullins,* 221 AD2d 770, 771, *lv denied* 87 NY2d 1022, 88 NY2d 851; *People v Fanfan,* 207 AD2d 907, 908, *lv denied* 84 NY2d 1031; *People v Kavanaugh,* 207 AD2d 719, *lv denied* 84 NY2d 937; *People v Peterson, supra,* at 127-129).

Accordingly, the judgment should be affirmed.

PINE, J. P., WISNER, HURLBUTT and GORSKI, JJ., concur.

Judgment unanimously affirmed.