Matter of N.w. (C.i.) (2003 NY Slip Op 51491(U))

[*1]

Matter of N.W. (C.I.)

2003 NY Slip Op 51491(U)

Decided on September 10, 2003

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 10, 2003

Family Court, Monroe County
In the Matter of Commitment of Guardianship and Custody, 
 pursuant to Social Services Law, § 384-b, of N.W., a Child under the age of Eighteen years, Alleged to be Permanently Neglected by
C.I., Respondent.
Docket No. B126-01/03A

MARILYN L. O'CONNOR, J.
The Department of Human and Health Services on February 28, 2003 filed an order to show cause and petition for violation of the controlling order suspending judgment. The order which was allegedly violated adjudged that N. W. (d/o/b 9/20/98) is a permanently neglected child, having been permanently neglected by, and suspended that judgment based on certain conditions, including not allowing Mr. W., the child's father, to have contact with or be in the same place as the child under any circumstances. This condition was a critical condition, because Mr. W. had previously brutally beating N. W.R., causing numerous broken bones. He had also burned N.W. Mr. W. had been ordered to stay away from the girl. (Order of Hon. Michael Miller, Sept 16, 1999, N -97-99). This court issued a Permanent Order of Protection requiring that the respondent/mother "Do not, under any circumstances, allow [Mr. W.] to have contact with or be in the same place as the child." (Sept. 18, 2001, N157-01).
The new allegations were that the mother had allowed Mr. W. to have contact with the child on several occasions, in violation of the order, between Christmas 2002 and February 18, 2003. For the reasons stated below, the violation petition is sustained, based on a preponderance of the evidence. The suspended judgment, which lasted until August 5, 2003, and was necessarily extended through the date of this decision will not be extended any further. There are no "exceptional circumstances", as required by law, to justify a further extension (Family Court Act, § 633[b]). Instead, the mother's rights will be terminated and N.W. freed for adoption The mother has run out of time to prove she is capable of caring responsibly for N.W..
The child has been in foster care since March 7, 1999, i.e., since she was less than 6 months old. While the mother has fulfilled many of the conditions of the controlling order, it appears from the preponderance of the evidence that she has violated the critical condition that she prohibit any contact with Mr. W. While the evidence could have been stronger, it was adequate, and this court must act in the best interests of the child (FCA § 631) and allow her to finally be freed for adoption by a new order of disposition.
The evidence shows that because the prospective adoptive mother/foster mother was told [*2]by the child that she had seen her "daddy" several times and that he lived "in the basement" of the mother's residence, DHHS set about to determine whether or not Mr. W. was at least visiting the mother and seeing the child. Accordingly, two men, Investigator Thomas Erdle of the Monroe County Law office and caseworker Matthew White, set up a surveillance post at the foot of Bestart Street, where the mother and child lived on February 18, 2003, a day the mother was to have visitation with N.W.. The result of this surveillance was evidence which results in a finding of a violation of the order by respondent/mother.
 While watching and waiting, Erdle soon spotted two men in the process of leaving the mother's home via her front door on February 18, 2003. He alerted the caseworker Matthew White. Though too late to see the two men actually exit through the apartment door, caseworker Matthew White immediately recognized that one of the men whom he saw on the front porch of the respondent's apartment was Mr. W. The caseworker and investigator, who were in a parked car, were about the courtroom's length away from the car according to White, or 150 feet according to Erdle. Thus it is not surprising that they chose to drive the car around the block to get closer to the two men for identification purposes. In the end White was sure that one of the two men who had been on the mother's porch was Mr. Erdle was "pretty sure it was [Mr. W.]." Both men had seen Mr. W. before, and they had a copy of a photograph of him. White had seen Mr. W. twice, once in court for a long period of time. Erdle had seen him once. The proof established, without contradiction, that the child was visiting her mother at her home at the time these men exited from the mother's home at 28 Bestart Street. The child had been dropped off at about 11:45 AM or 12 noon, and Mr. W. was seen at approximately 12:30 PM. Thus, the court must conclude that the respondent mother had violated the court's order by letting Mr. W. into her apartment at a time that the child was present. This violated the order requiring that Mr. W. not be "in the same place" as the child.
The mother denied that the man seen exiting her front door and on the porch was Mr. W.. However, her testimony was not credible. She claimed that the man must have been some cousin of Mr. W. whom she knew only as "Twin". She testified, "They're twins. I call him Twin. That's all I know." Obviously, Mr. W. and his cousin cannot be "twins". Respondents lack of knowledge about "Twin" was not credible.
It was unfortunate that this case came down to a case of conflicting testimony over the identification of a man seen leaving respondent's home. White and Erdle had a video camera with them but did not use it. The only explanation given was that they did not want to be conspicuous. However, they did not use it even when pursuing the two men in an effort to confirm close-up that one of them was Mr. W. Videotapes are powerful evidence (Tai Tran v. New Rochelle Hosp. Med. Ctr., 99 NY2d 383; People v. Patterson, 93 NY2d 80), and videotaping is a fair and effective tool in identification (People v. Edmonson, 75 NY2d 672). While the sighting happened quickly, surveillance was their task and they could have been, indeed should have been, better prepared to prove their case. 
Additionally, White and Erdle did not speak with Mr. W. or to Mr. W., though either could have called out his name to see if he responded to it, and they could have tried to strike up a conversation which could have strengthened their identification of Mr. W.. They also failed to get the license number on the car in which the two men rode, since they didn't have "enough time". These short-comings are surprising for two experienced workers given the task of [*3]surveilling a home for Mr. W.. However, the surveillance testimony, given by witnesses with no inherent bias, is adequate to support a finding of a violation by respondent..
The evidence of the February 18, 2003 identification by White and Erdle is generally consistent with the admissible hearsay evidence of the child in which she told her prospective adoptive mother and the caseworker that she had seen her daddy at least twice. However, the small child's hearsay testimony never clearly set forth that she saw Mr. W. inside the mother's apartment. Her hearsay testimony indicated Mr. W. had been in her mother's bedroom, but did not indicate she saw him there. She apparently said that Mr. W. lived in the basement but the respondent testified she does not have access to the basement from her second floor apartment and this was not contradicted. There was no other evidence that Mr. W. actually lived in the basement. Also, the mother explained every alleged contact in a way that did not violate the order or place her at fault, though her explanations were not totally convincing. For example, the respondent/mother said Mr. W. just stopped by on Christmas to bring a present and did not go in the house, and that she had not told him N.W. would be present. Of course, Mr. W. should not have taken the chance that the girl would be there on Christmas, a typical visitation day, and the mother should have made certain he did not stop by at such an inopportune moment. The respondent said they saw Mr. W. at his mother's church and he promptly left. This may be true, but again, the mother should not have taken this risk of contact. (It was ultimately clear that the respondent, Mr. W. and child did not walk together to church as had at first seemed possible from the testimony.) The respondent/mother also claimed they had seen the father on the street, by coincidence. This could have resulted in the girl saying she had "seen" daddy but would not violate the order. The prospective adoptive mother was inherently biased since she wants to adopt the child and thus needs termination of respondent's rights as a parent. Still, she did not come across as one who was trying to mislead the court, and for what it was worth, her testimony regarding what the child had told her was credible though not particularly helpful due to its limited substance. Thus, the girl's hearsay statements were not persuasive evidence.
Still, the preponderance of the evidence is not a particularly high standard of proof. In the end, the evidence given by two professionals who have no reason to lie is strong enough to outweigh the mother's repeated flimsy denials when the need for the child to have a permanent home is great. The little girl has been in foster care for 51 months well beyond the 15 month guidelines of ASFA.Lack of progress toward being able to parent responsibly weighs in favor of adoption (E.g., Matter of James H., 281 AD2d 920.) The respondent admitted she was pregnant at the time of the hearing. By getting pregnant again,[FN1] and thus putting herself in a position of needing to try to take care of a new baby in addition to N.W., the respondent had made it harder to become a competent mother of her already existing daughter. On the other hand, if the respondent plans to simply put the new baby in foster care or give it up for adoption, she is not demonstrating behavior appropriate for a mother who must convince the court she should be given the right as a responsible parent to raise her child after having been found to have neglected that child in the past. Under all the circumstances, it must be concluded that this respondent mother, despite some good intentions, has used up her suspended judgment "second chance" to regain the right to raise her child. (See Matter of Michael B., 80 NY2d 299).
[*4]
Of course, the presence of a loving pre-adoptive home for N.W. also weighs in favor of adoption, and thus in favor of termination as well (E.g., In re Phillip D., 266 AD2d 909). Finally, it should not be overlooked that the law guardian recommends adoption, and his opinion is entitled to considerable weight. (E.g., Matter of Nathaniel T., 67 NY2d 838.)For the reasons set forth above, it is
FOUND AND ADJUDGED that the respondent violated the permanent order of protection in the Order Suspending Judgment issued August 6, 2002 and signed September 30, 2002 requiring that she not, under any circumstances "allow [Mr. W.] to . . .be in the same place as the child"; and it is further
ORDERED that the parental rights of respondent Ms. C. I. are suspended, N. W. is freed for adoption, her guardianship and custody is granted to the Monroe County Department of Health and Human Services with a permanency goal of adoption, and the County of Monroe may consent to her adoption.
DATED: September 10, 2003
 Rochester, NY __________________________________
 HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
Decision Date: September 10, 2003
Footnotes

Footnote 1: The respondent testified the father was not Mr. W.